The surviving widow in community and legal heirs of the late W. J. Byrd instituted a jactitation or slander of title suit against the defendants, J. M. Forgotson, J. E. *Page 278 
Smitherman, Mrs. Mabel M. Palmer, John R. Palmer, Nellie Norton, the Atlantic Refining Company, and the Triangle Drilling Company, Inc., to have cancelled and erased from the conveyance records of Claiborne Parish the instruments whereunder Byrd transferred and the defendants procured the mineral rights affecting the SE1/4 of the NW1/4 of Section 17, T. 19 N., R. 5 W., Claiborne Parish, on the ground that this mineral interest has become prescribed because of nonuse for a period of ten years.
The defendants, admitting their right to the mineral interest in question is dependent upon the instruments thus sought to be cancelled, asserted this interest has not prescribed by nonuse because such prescription was interrupted by the drilling of a well on the tract of land affected by the servitude created by Byrd's sale of an undivided half interest in the minerals to W. M. Brothers in 1925 (which includes the 40-acre tract in controversy) and by the acquisition by minors through inheritance of fractional parts of the servitude. In reconvention they pleaded that they be recognized as the owners of an undivided half of the mineral interest in this property in the proportions assertedly owned by them, which are as follows: J. E. Smitherman, 1/8th; Mrs. Mabel Palmer and John R. Palmer, as the widow in community and only heir of E. G. Palmer, 1/8th; the Atlantic Refining Company, 1/8th; Nellie Norton, 1/16th; J. M. Forgotson, 1/48th; and the Triangle Drilling Company, Inc., 1/24th. *Page 279 
After the case had been tried on an agreed stipulation of fact, supplemented by the various mesne conveyances through which the defendants claim their mineral interest, the trial judge rendered judgment rejecting the demand of the plaintiffs and decreeing the defendants to be the owners of the mineral interest in the proportions prayed for.
From this stipulation of fact and the instruments in evidence, it appears that on April 6, 1925, W. J. Byrd, then the owner in full and perfect ownership of the S1/2 of the NW1/4 and the NE1/4 of the NW1/4 of Section 17, and the SE1/4 of the NE1/4 of Section 18, T. 19 N., R. 5 W., Claiborne Parish, Louisiana, executed a mineral deed whereby he conveyed to W. M. Brothers an undivided half interest in and to all of the minerals affecting these four 40-acre tracts that are contiguous, and, together, comprise 160 acres. Brothers, in turn, and before the end of 1925, sold all of the undivided mineral interest thus acquired by him to various other parties in fractional parts, with the result that all of the mineral rights affecting the SE1/4 of the NW1/4 of Section 17 thus acquired by Brothers in 1925 is now owned by the defendants in the proportions just above given. However, it appears that of the parties acquiring the Brothers mineral interest in the remainder of the 160-acre tract, Wilson T. Peterman, whose interest affected the SW1/4 of the NW1/4 of Section 17, died intestate on March 22, 1930, leaving a surviving widow *Page 280 
and three children, one of whom died on November 18, 1935, leaving a minor child who had been born on November 2, 1930, while J. M. Melton, whose interest affected the SE1/4 of the NE1/4 of Section 18, died intestate on April 23, 1934, leaving three minor children. The rights of none of these four minor children had been disposed of at the time this suit was instituted. In addition, drilling operations were begun on April 16, 1927, on the NE1/4 of the NW1/4 of Section 17, under a mineral lease covering the entire 160-acre tract executed by Byrd in favor of the Triangle-Drilling Company, Inc., on March 18, 1924, prior to Byrd's execution of the mineral deed in favor of Brothers, such sale having been made subject to this lease. The well thus begun was abandoned on May 12, 1927, at a depth of 2,812 feet. Further, drilling operations were begun on the SE1/4 of the NW1/4 of Section 17 (the tract in controversy) in February of 1943 under a lease executed by Byrd on April 1, 1937, in favor of O. J. Rowe (subsequently assigned to and now held by Roy Lee as the trustee for the Hassie Hunt trust), and a well was completed under these operations as a producer on March 30, 1943. After the completion of this well, the defendants in this suit, between August and October of 1943, sought to concur in the lease from Byrd to Rowe by the execution of co-lessor agreements. Feeling that the execution of these agreements constituted a slander of their title, the plaintiffs instituted this suit on November 5, 1943. *Page 281 
When oil was first discovered in this state and the interests of those asserting rights therein became controversial, the courts decreed that the sale of a mineral was nothing more than the granting of a right or privilege to go upon the land for exploration and exploitation purposes, classified such a right as being in the nature of a servitude, and applied the provisions of the Revised Civil Code relative to servitudes in determining the rights of those claiming such an interest. One such provision is that the right to a "servitude is extinguished by the non-usage of the same during ten years" (Article 789), such prescription beginning to run from the day the servitude ceases to be used. Article 790. But "If among the coproprietors there be one against whom prescription can not run, as for instance a minor, he shall preserve the right of all the others." Article 802. See, also, Sample v. Whitaker,172 La. 722, 135 So. 38; State ex rel. Bourgaux v. Fontenot, 192 La. 95,187 So. 66; Ohio Oil Company v. Cox, 196 La. 193, 198 So. 902; and Standard Oil Co. of Louisiana v. Futral, 204 La. 215,15 So.2d 65.
Counsel for the plaintiffs, however, contends that inasmuch as Brothers disposed of the servitude on this entire 160-acre tract of land by selling it piecemeal and fractionally to numerous persons, each interest thus sold affecting a different surface area, no portion of his undivided half mineral interest in and to the entire tract being sold to any one individual, and inasmuch as none *Page 282 
of the co-owners or co-proprietors of the SE1/4 of the NW1/4 of Section 17 are minors or other persons incapacitated under our law (the Melton and Peterman heirs not being co-owners of the mineral interest affecting this particular 40-acre tract), the provisions of Article 802 of the Revised Civil Code have no application.
When, in 1925, the ancestor in title of the plaintiffs executed the mineral deed to Brothers affecting the entire 160-acre tract of land, all parts of which are contiguous, he created only one servitude. Lee v. Giauque, 154 La. 491, 97 So. 669; Patton v. Frost Lumber Industries, 176 La. 916, 147 So. 33; Hodges v. Norton, 200 La. 614, 8 So.2d 618. Such servitude is indivisible. The subsequent sale of this servitude in fractional parts affecting different surface areas of the tract did not have the effect of dividing the single servitude thus created on the entire tract. Hodges v. Norton, supra.
Counsel for the plaintiffs, however, contends the Hodges case has no application and is not controlling here because the owners of the original servitude in that case never relinquished all of their interest in the servitude, retaining a half interest affecting the entire tract, and that it was, therefore, immaterial whether the transferee of a portion of their interest in this entire servitude did dispose of the interest acquired by him by selling the portion affecting approximately half of the surface area, retaining the remainder for himself, *Page 283 
because in the instant case the "defendants themselves, in effect, divided this servitude as to the surface area by designating the superficial area to which they wanted their mineral rights to apply, that is, the SE1/4 of the NW1/4 of Section 17. * * * They knew they were not acquiring mineral rights over the entire 160 acres and over the entire original servitude. * * * These minors are not coproprietors of the defendants in the SE1/4 of the NW1/4 of Section 17."
We think counsel has misinterpreted the issues in the Hodges case. In that case Esmond Hodges and his wife, Augusta Ann, on November 6, 1915, sold a tract of some 440 acres of land to A. J. Hodges, reserving unto themselves an undivided half interest in the oil, gas, and other minerals thereunder for a restricted period of fifteen years. Thereafter Hodges died and his widow and heirs, on October 29, 1923, sold an undivided one-fourth interest in the minerals in the entire acreage to J. A. Selby, Jr., or an undivided half of their reserved undivided half interest, though no mention was made of the fifteen year restriction. Two days later on October 31, 1923, Selby sold the interest thus acquired by him from Augusta Ann Hodges and her children to R. W. Norton, but only inasmuch as this interest affected two non-contiguous tracts of the 440 acres, — one of 80 acres and the other of 140 acres — he retaining the mineral interest acquired by him in and to the remaining 220 acres. Again no mention *Page 284 
was made of this restricted period of fifteen years. On November 21, 1923, A. J. Hodges released Selby from the "reversionary" rights in so far as they affected the undivided fourth interest purchased by Selby from Mrs. Hodges and her children and on the following day Selby reconveyed this release back to A. J. Hodges, limited, however, to the mineral rights sold Norton by Selby. Two wells were drilled in 1924 under a lease executed by Mrs. Hodges, her children, and A. J. Hodges prior to the sale of this undivided fourth mineral interest to Selby. These wells were located on the land not affected by the interest purchased from Selby by Norton, and they continued to produce until 1931. It was contended that Hodges — by the conveyance of the reversionary rights to Selby on November 21, 1923, and the re-conveyance of these rights back to Hodges on the following day, with the exception of the 220 acres affected by Selby's mineral sale to Norton — intended to establish a new servitude in favor of Norton by reducing it from the fifteen year restrictive period provided in the original reservation by Esmond Hodges and his wife to the ten-year prescriptive period provided in Article 789 of the Revised Civil Code. In disposing of that issue the court said: "The land upon which the servitude was established is one continuous tract. There was but one indivisible servitude and the mere fact that the mineral owners conveyed undivided interests in the right to others *Page 285 
did not have the effect of dividing it. See Lee v. Giauque,154 La. 491, 97 So. 669; Patton v. Frost Lumber Industries, Inc.,176 La. 916, 147 So. 33; Connell v. Muslow Oil Co.,186 La. 491, 172 So. 763, and Ohio Oil Company v. Cox, 196 La. 193,198 So. 902. The reason for this is that a servitude can only be created by the owner of the land. Therefore, when the widow and children of E. W. Hodges conveyed an undivided one-fourth interest in minerals to Selby, the servitude convering the entire land remained intact. Likewise, when Selby conveyed to Norton a one-fourth interest in the minerals in and under 220 acres of the tract, the servitude was not divided and exerciseof the servitude on any portion of the land preserved it as tothe whole." (Italics ours.)
It is our opinion, therefore, that the fact that the interest of the minors is limited to the rights and benefits accruing from the exploitation of these minerals on the small tract of land affected by their interest does not prevent the suspension of the prescription running against the entire servitude. Such suspension enures to the benefit of the major co-owners of the servitude (although their right to benefit by the exploitation of the minerals is limited to a different surface area than that in which the interest of the minors is vested) the same as if the servitude had been exercised by the drilling of a well on the surface area affected by the interest of the minors and the prescription thus interrupted *Page 286 
had begun to run again as to all parties owning an interest in the servitude.
For the reasons assigned, the judgment appealed from is affirmed, at the cost of the appellants.