87 So.2d 111

**P. F. CHILDS**

**v.**

**Mrs. Blanche WASHINGTON et al.**

No. 42151.

March 26, 1956.

Hobbs & Yeates, Minden, for plaintiff-appellant.

John M. Shuey, Shreveport, for defendants-appellees.

FOURNET, Chief Justice.

This is a suit by a landowner to have decreed extinguished, for non-use of ten years, a certain mineral servitude affecting his property executed on January 15, 1937; and from an adverse judgment, he prosecutes this appeal.

According to an agreed statement of facts the plaintiff, P. F. Childs, owner of an 80 acre tract of land in Webster Parish—the N/2 of the SW/4, Section 8, T. 21 N., R. 9 W.—on January 15, 1937, sold to C. P. Talbot, B. V. Bentley and O. V. Pickens one-half of the oil, gas and other minerals on and under the above described property. On April 12, 1941, the three last named persons sold to Robert F. Morgan 3/16ths of the oil, gas and other minerals in and under the tract, and some two weeks later the plaintiff, for a valuable consideration, executed an instrument in which he formally acknowledged Morgan's 3/16ths interest for the stated purpose of interrupting prescription as of April 12, 1941, the date of Morgan's acquisition. Shortly thereafter Morgan

transferred a half of the interest he had acquired to Mrs. Blanche Washington, one of the defendants herein; the other defendant, Mrs. Minnie E. Abshier, claims the remaining interest of Morgan (3/32nds) as universal legatee under his will—he having died, leaving neither ascendants nor descendants and no forced heirs nor surviving spouse. It further appears from the agreed facts that while there was no drilling on any part of the tract from the date of the sale to Talbot, Bentley and Pickens, on January 15, 1937, to the time suit was filed, the Department of Conservation, following hearings held on January 11 and 12, 1950, issued its Orders Nos. 10–W and 10–X, both dated April 15, 1950, each of which included, within producing units already established by previous Orders, a portion of the acreage affected by the mineral servitude with which we are here concerned; the former Order, pooling and consolidating productive portions of the Bodcaw Sand Reservoir, was made effective immediately, and the latter Order, affecting production in the Davis Sand, was made effective as of September 1, 1948; and accordingly, in 1953, the plaintiff and defendants each received his pro rata share of production from these respective sands and has continued to receive monthly payments. With respect to Order 10–W, affecting the Bodcaw Sand Reservoir, its provisions are implemented by the Cotton Valley Unitization and Pressure Maintenance Agreement which has been ratified by the plaintiff landowner and the defendants here, although as to the exact dates of such ratifications the record is not clear.

The trial judge, observing that the exact question—whether the mere inclusion in a producing unit, by Order of the Commissioner of Conservation, of a portion of the acreage affected by a mineral servitude, prevents accrual of prescription because of non-use of the servitude—has never been squarely presented to this Court, and expressing the personal feeling that plaintiff's position is more equitable and would perhaps be the best answer to the problem involved, yet felt constrained to find for the defendants because "The appellate courts have uniformly held that a servitude is indivisible and that production from a unit created by the Department of Conservation will affect lands both in and out of the unit, even though drilling is not conducted on the particular piece of property in question."[1]

Counsel for plaintiff-appellant, citing cases in which (he says) the rulings of this Court have actually reduced or divided servitudes, likens the orders of the Commissioner of Conservation herein to a contract between the parties by which they di-

---

1. The trial judge's conclusion is based on the decisions of this Court in the cases of Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10; LeBlanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855; and Sanders v. Flowers, 218 La. 472, 49 So.2d 858.

vide the servitude; and asserting that the Commissioner, in the exercise of his police power to conserve the State's natural resources, has power to contract for the parties, contends that he, the Commissioner, simply did that which the parties could have done by contract among themselves, and unitized those minerals within the pooled lands; but that such act did not interrupt prescription as to the remainder of the tract—citing Elson v. Mathewes, 224 La. 417, 69 So.2d 734.

▬▬ While it is true that in the evolution of mineral law in this State, a mineral grant or reservation came to be defined as a servitude,[2] the rights of which, according to the provisions of the Civil Code, are not susceptible of division,[3] and numerous cases may be found containing expressions maintaining the indivisibility of a servitude,[4] yet in the case of Ohio Oil Co. v. Ferguson, 213 La. 183, 34 So.2d 746 (which ruling was the basis for the decision of this Court on rehearing in the case of Byrd v. Forgotson, 213 La. 276, 34 So.2d 777), it was held by a divided court that since the advantages resulting from a servitude are susceptible of division[5] it followed that where one acquired from the owner of a 1/4th mineral interest covering a 240 acre tract, that owner's interest in a 40 acre subdivision thereof, prescription of ten years accrued and extinguished the servitude as to the 40 acre tract notwithstanding the fact that as to the remaining 200 acres the servitude was maintained by drilling operations and production by the owner of the mineral interest therein. And, as pointed out in the recent case of Elson v. Mathewes, 224 La. 417, 69 So.2d 734, 735, "A grant by a landowner of a mineral interest, under the established jurisprudence of this court, does create a servitude which is indivisible in the sense that the grantor thereafter

2. Sample v. Whitaker, 172 La. 722, 135 So. 38; Clark v. Tensas Delta Land Co., 172 La. 913, 136 So. 1; Patton v. Frost Lumber Industries, 176 La. 916, 147 So. 33; Childs v. Porter-Wadley Lumber Co., 190 La. 308, 182 So. 516.

3. Art. 656, LSA–Civil Code of 1870: "The rights of servitudes, considered in themselves, are not susceptible of division, either real or imaginary. It is impossible that an estate should have upon another estate part of a right of way, or of view, or any other right of servitude, and also that an estate be charged with a part of a servitude. The use of a right of servitude may be limited to certain days or hours; but thus limited, it is an entire right, and not a part of a right. * * *"

4. Lee v. Giauque, 154 La. 491, 97 So. 669; Patton v. Frost Lumber Industries, 176 La. 916, 147 So. 33; Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; Hodges v. Norton, 200 La. 614, 8 So.2d 618.

5. Art. 657, LSA–Civil Code of 1870: "Though the right of servitude be indivisible, and must be established for the whole, and not for a part, nothing prevents the advantage resulting from it from being divided, if it be susceptible of division; as, for example, the right of taking a certain number of loads of earth from the land of another, or of sending to pasture a certain number of animals on the land of another."

cannot contract independently with a third person to effect a division of that servitude to the disadvantage of the mineral owner. But there is no law prohibiting the landowner and the mineral owner from entering into a contract with each other, as was done by and between these litigants, whereby a division or a reduction of the servitude results"; and held that whereas, due to the said agreement, the servitude was extended as to the tract incorporated in the unit, the failure of the agreement to mention the remaining acreage affected by the mineral servitude, along with failure to use the remaining acreage during the prescriptive period, resulted at the end of ten years in the extinguishment of the servitude to the extent of the acreage outside the unit. Cf. Spears v. Nesbitt, 197 La. 931, 2 So.2d 650.

Our conservation laws relating to minerals—their purpose being to protect, conserve and replenish the natural resources of the State and to prohibit and prevent the waste or any wasteful use thereof—become a part of the contract between the parties when such contract deals with the minerals lying in and under the lands of the State.[6] One of these laws, a comprehensive conservation statute enacted as Act 157 of 1940, now LSA–R.S. 30:2 et seq., requires that the Commissioner of Conservation, if he finds it necessary in order to prevent waste and to avoid drilling unnecessary wells, "shall establish a drilling unit or units for each pool", LSA–R.S. 30:9, subd. B [7] and contains the provision that owners may validly agree to pool their interests and to develop their lands as a drilling unit, but directs that in the absence of such agreement the Commissioner "* * * shall require them to do so and to develop their lands as a drilling unit * * *"—orders so requiring to be made after notice and hearing, and upon terms which will afford to each owner within the unit an opportunity to receive his just and equitable share of the oil and gas in the pool without unnecessary expense. LSA–R.S. 30:10, subd. A.

In construing the provisions of such statutes, we must do so in the light of the applicable codal articles, within the framework of previous jurisprudence and pursuant to a general pattern, being not unmindful of the comprehensive scope, elasticity and flexibility of the civil law, so as to formulate rules which will apply

---

6. Robinson v. Horton, 197 La. 919, 2 So. 2d 647; Johnson v. Anderson-Dunham Concrete Co., 212 La. 276, 31 So.2d 797; Williston on Contracts, Revised Ed., Vol. 3, Sec. 615.

7. "A drilling unit" according to the further provisions of LSA–R.S. 30:9, subd. B "as contemplated herein, means the maximum area which may be efficiently and economically drained by one well. This unit shall constitute a developed area as long as a well is located thereon which is capable of producing oil or gas in paying quantities."

in any case at present foreseeable in the development of our mineral law.

■ It logically follows, therefore, that if the landowner and the mineral owner can by agreement extend the servitude as to a portion only of the acreage without by such act interrupting the tolling of prescription as to the servitude on the remainder of the tract, as held in Elson v. Mathewes, supra, and if the mineral owner can divide the advantages of a servitude by assigning to a third person all of his interest in a designated portion of the land affected by the servitude and create a situation whereby user of a portion would not hold the remainder, as held in Ohio Oil Co. v. Ferguson, supra, and Byrd v. Forgotson, supra, then clearly when the Commissioner of Conservation, acting for the State in the exercise of its police power, by his orders and after due hearing, included within a unit or units portions of a tract as to which owners had failed to agree to pool their interests for development purposes, his act produced the same result as if the parties had formed a drilling unit by convention and for development purposes had reduced the servitude to that extent.

■ We therefore conclude, as to the portion of plaintiff's land included in the units formed by Orders Nos. 10–W and 10–X of the Commissioner of Conservation, dated April 15, 1950, that the servitude has been kept alive and extended by production; but as to the portion not included within said units, that the servitude has become extinguished because of nonuse during a period of ten years. See, also, Jumonville Pipe and Machinery Co., Inc., v. Federal Land Bank of New Orleans, 230 La. 41, 87 So.2d 721.

Two of the cases relied on by the defendants, and upon which the trial judge based his conclusions, Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10, and Le Blanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855, were decided under rules of law governing leases and clearly have no application to servitudes; other cases relied on by defendants involve different factual situations and are not controlling

For the reasons assigned the judgment appealed from is reversed and set aside, and it is now ordered, adjudged and decreed that the servitude created on January 15, 1937, and acknowledged on April 12, 1941, affecting the N/2 of the SW/4, Section 8, T. 21 N., R. 9 W., Webster Parish, with the exception of the portions embraced within units established by Orders of the Commissioner of Conservation Nos. 10–W and 10–X, dated April 15, 1950, is extinguished by the prescription of ten years liberandi causa; and to that extent its inscription and conveyances thereunder are ordered cancelled from the public records of Webster Parish; all costs of court to be divided equally between plaintiff and defendants.

McCALEB, Justice (concurring).

I am persuaded that the main opinion reaches a desirable result in keeping with a realistic view of the problem confronting this Court in applying the Articles of the Civil Code to mineral servitudes in conjunction with lawful orders entered by the Commissioner of Conservation pursuant to modern techniques for the efficient recovery of oil and other minerals. While it can hardly be gainsaid that the extraction of oil from the portion of the encumbered land contained in the drilling units constituted a user of the servitude in a real sense, it was only because of the unitization orders that this user was effective in law forasmuch as no drilling explorations were ever conducted on any part of the land subject to the servitude. This being so, it seems only proper to conclude that interruption of prescription extends only to that portion of the land covered by the servitude from which the oil is actually withdrawn or where the user has taken place—that is, the part included within the drilling unit.

Under ordinary conditions a servitude is a whole right incapable of division. However, as this right may be subordinated to all lawful orders made in the interest of conservation, the conclusion appears inescapable that, when drilling units are established embracing a portion of the area subject to the servitude, its area is reduced by operation of law and the area lying within the drilling units excluded

therefrom as long as the unitization order remains in effect.

I concur in the decree.