FOURNET, Chief Justice.
Trunkline Gas Company,' Cyprus Mines Corporation and Phelps Dodge Corporation, as owners of mineral leases affecting several contiguous tracts of land belonging to C. S. Steen Syrup Mill, Inc.,[1] and described hereinbelow,[2] portions of which are located in the Grosse Isle Field, Vermilion Parish, initiated this concursus proceeding to have resolved the ownership of accrued royalties claimed by two opposing groups, hereinafter referred to as Group One [3] and Group Two.[4] The matter is now before us *525 on a writ of certiorari granted on the application of Group Two to review the judgment of the Court of Appeal, Third Circuit, which reversed the judgment of the district court in their favor and decreed Group One to be the owners of the proceeds. 179 So.2d 546.
The case was tried on facts stipulated by counsel and they are to the effect that C. S. Steen Syrup Mill, Inc., as the owner of the property described in footnote two (hereinafter referred to as the Mill Property[5]) by deed, dated June 22, 1949, conveyed to Group One an undivided mineral interest in the property and on June 30, 1956, sold the remaining interest to Group Two. On the application, of the petitioners who had acquired mineral leases on this property by assignment, the Commissioner of Conservation issued Order No. 447 effec *527 tive January 1, 1959, establishing D-l Sand Unit 2,[6] pooling, consolidating and integrating all separately owned tracts, mineral leases and other property interests, including 96.25 acres [7] of the Mill Property. Texaco, Inc., having been designated by the Commissioner as the unit operator, commenced good faith drilling on March 10, 1959, on *529 the Mill Property included in the unit, and continued to do so until June 14, 1959. On July 22nd, the Commissioner issued his Order No. 447-B, effective August 1, 1959, establishing “A” Sand Unit 2 which had the same surface boundaries as that of D-l Sand Unit 2. As neither was productive, all operations in connection therewith were abandoned on August 10, 1959.

*527

*529 On December 1, 1960, Unit 2 as to both Sands D-l and “A” was dissolved by Orders of the Commissioner, Nos. 447-D and 447-B-l, which at the same time created two new units in Fault Segment “A”, defined as the Stansbury Sand Unit[8] and the A-l Sand Unit,[9] the former containing 25.58 acres, the latter 38.79 acres of the Mill Property not previously unitized and it is the production from these units allocated to these acreages — $5,247.57 from the Stansbury Sand, $8,999.13 from the A-l Sand— that forms the basis of this controversy.
In the meantime, C. S. Steen Syrup Mill, Inc., executed an instrument dated June 23, 1959, purporting to sell to Group Two the same mineral rights in that portion of the tract lying outside the unit that it had previously conveyed to Group One, with other properties not at issue herein, in the proportion of interest to J. Wesley Steen, 14th to Albert C. Steen, and J4th to Lillian B. Steen Derveloy, for the recited . consideration of $200.
The trial judge, relying on the jurisprudence of this court as enunciated in Childs v. Washington, 229 La. 869, 87 So.2d 111 and Jumonville Pipe and Machinery Co. v. Federal Land Bank, 230 La. 41, 87 So.2d 721, held the drilling operations pursuant to Orders 447 and 447-B on Unit 2 did not interrupt prescription on that portion of the 1949 servitude lying outside of the unit; consequently, as to that portion, prescription had tolled. He therefore adjudged Group Two were entitled to the money in dispute.
The Court of Appeal, in reversing this judgment, distinguished the Childs and Jumonville cases, pointing out that in these cases the unit well was not located on a part of the parent tract included therein, whéreas in the case at bar, the operations on Unit 2 were located and conducted on the Mill Property incorporated in the unit, and followed the established jurisprudence of this State that private or contractual rights involving minerals are only superseded when they are in conflict with valid orders of the Commissioner of Conservation. The Court then concluded that the Commissioner’s Orders in no manner conflicted with these private contractual rights, and, therefore, had no effect thereupon.
Group Two in their application for review of the judgment of the Court of Appeal and in their brief filed in this court claim the *531 Court erred in its conclusion that the holdings of this court in the Childs and Jumonville cases are not controlling because those cases are factually different from the instant case. It is their contention that under the jurisprudence as enunciated in those two cases, the issuance of a valid order of the Commissioner creating a forced pooling unit in which is incorporated a portion of a tract of land upon which a servitude was imposed, has the effect of dividing that servitude; consequently, when the Commissioner issued his Orders No. 447 and -447-B, the 1949 servitude affecting the Mill Property was divided and severed into two separate servitudes, “each requiring sepa- ■ rate user for its continued existence.”
The Legislature of 1940, in pursuance to the authority granted it by Section 1, Article VI of the Constitution of 1921, creating a Department of Conservation under the control and direction of a Commissioner, to protect, conserve and replenish the natural resources of this State and prevent the waste thereof, adopted its Act 157, now R.S. 30:2-30:20. In adopting this comprehensive statute, the Legislature was very careful to provide that any order of the Commissioner impinging on valuable property rights or restricting the contractual rights of owners with respect thereto when necessary to the conservation of the natural resources of this State or to prevent the waste thereof, guaranteed each such owner would share in the production to the extent of his portion included in a drilling unit created by order of the Commissioner. R.S. 30:10 A(l) (a).
Clearly, therefore, any order of the Commissioner not necessary for the conservation of oil and gas resources of this State or to prevent their waste or one that would unnecessarily deprive an owner of his rights to property, as owner or under contract, would be illegal and unconstitutional for the Constitution of 1921 clearly provides that (1) “private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid,” (Article I, Section 2) and prohibits the passing of any law impairing the obligation of contracts, or the divesture of “vested rights * * * unless for purposes of public utility, and for just and adequate compensation previously paid.” (Article IV, Section 15). Such order would also be in violation of the Constitution of the United States, which prohibits the states from passing any law impairing the obligation of contracts, (Article 1, Section 10), as well as the taking of private property without just compensation, (the Fifth Amendment).
This court in the Childs v. Washington case, supra, in accordance with precedents in all cases involving private rights under contracts dealing with minerals, recognized that the conservation laws relating to minerals formed a part of the contract, and *533 in construing the provisions of such laws, relegated the effect of the Commissioner’s orders to the objective limitations of the Constitution, i. e., to the protection, conservation, and replenishment of “the natural resources of the State, and to prohibit and prevent the waste or any wasteful use thereof.” [10] with the result that one is required to yield his right to property, either as owner or by contract, in the public interest only under a valid order of the Commissioner, i. e., when the order is a conservation one, pure and simple, and which provides for one’s equitable share in the event of production. The court then, in resolving the rights of the individuals involved, did so within the framework of the previous jurisprudence, reasoning:
“It logically follows, * * *, that if the landowner and the mineral owner can by agreement extend the servitude as to a portion only of the acreage without by such act interrupting the tolling of prescription as to the servitude on the remainder of the tract, as held in Elson v. Mathewes (224 La. 417, 69 So.2d 734), and if the mineral owner can divide the advantages of a servitude by assigning to a third person all of his interest in a designated portion of the land affected by the servitude and create a situation whereby user of a portion would not hold the remainder, as held in Ohio Oil Co. v. Ferguson (213 La. 183, 34 So.2d 746), and Byrd v. Forgotson (213 La. 276, 34 So.2d 777), then clearly when the Commissioner of Conservation, acting for the State in the exercise of its police power, by his orders and after due hearing, included within a unit or units portions of a tract as to which owners had failed to agree to pool their interests for development purposes, his act produced the same result as if the parties had formed a drilling unit by convention and for development purposes had reduced the servitude to that extent.” The court then concluded the portion of the servitude' not included in the units had prescribed because of non-use, but as to the portion of plaintiff’s land included in the units,' held the servitude had been “kept alive and extended by production,” although the well had not been drilled on the parent tract.
We do not think a review of the Childs and Jumonville cases and the precedents upon which they were based supports the contention of Group Two that the issuance of the order by the Commissioner creating a forced unit, including a portion of a tract upon which a servitude is imposed, has the effect of dividing that servitude into two separate servitudes “each requiring separate user for its continued existence.”
*535 In the evolution of the mineral law in the State, it was recognized that the sale or reservation of a mineral right, having been classed as a servitude, was subject to the applicable articles of the Civil Code in the resolution of conflicting claims; and in deciding the early and landmark case of Ohio Oil Co. v. Ferguson, supra, the precedent upon which succeeding decisions, including Childs v. Washington, supra, and Jumonville Pipe and Machinery Co. v. Federal Land Bank, supra, were predicated, we concluded the articles of the Civil Code in Title IV, entitled, “Of Predial Servitudes ór Servitudes of Land”, whenever applicable were controlling. In that case, this court in the original opinion, written by the late Chief Justice Charles A. O’Niell, holding that production on 200 acres of a 240-acre servitude did not interrupt the running of prescription on the 40 acres thereof previously sold, reasoned:
“There is no difference, in the applicable principles of law, between a servitude which gives to two or more persons the right to draw water from the land of another and a servitude which gives to two or more persons the right to take the mineral oil or gas from the land of another. Nor is there any difference, in the applicable principles of law, between the dividing of the advantage of such a servitude by stipulating on what days each of the persons to whom the servitude is due may exercise his right, and dividing the advantage by stipulating the part of the land on which each of the persons to whom the servitude is due may exercise his right. Hence we may substitute, the words ‘mineral oil or gas’ for the word ‘water’, and substitute the words ‘different parts of the land’ for the words ‘different days’, and thus paraphrase the second paragraph of article 803 of the Civil Code, by saying that if a mineral servitude be due to two or more persons, but on different parts of the land that is subject to the servitude, he who does not exercise his right to explore for the oil, gas or other minerals in that part of the land on which he has the right loses it for nonuse for the period of 10 years, and the land subject to the servitude becomes free from it as respects him.”
On Rehearing, in an opinion handed down by Mr. Justice Hawthorne, this court in applying the same articles of the Code concluded the sale by the owner of the 240-acre servitude of all of his mineral interests thereto in a particular portion in the original tract “is analogous to the division of the dominant estate by the sale of a portion of it" and in determining what effect a division of a dominant estate would have on the indivisibility of the servitude existing in favor of it and on the prescription of that servitude, the author proceeded thusly :
“Applying the provisions of the quoted articles (776, 789, 801 and 803 of the Civil *537 Code)[11], let us assume that A, the owner of a servient estate, has established a servitude of passage in favor of the dominant estate, owned in indivisión by B and C. B and C divide equally the estate in whose favor the servitude was established. Under Article 776 it is clear that the servitude or right of passage remains due for the portion of the estate allotted to B and likewise remains due for the portion allotted to C.
“How, exactly, has the division of the dominant estate affected the servitude? Obviously the servitude or right of passage, considered of itself, has not been divided. Under Article 656, B does not now have half a right of passage and C half a right of passage. Each still has a whole right of passage. However, the area or portion of the estate from which B and C may exercise their servitude has been limited by the division of the estate, without any additional burden’s accruing to the servient estate of A. B may now exercise his right only from that portion of the dominant estate which he owns, and C may exercise his right only from that portion which he owns. The servitude therefore has not been divided, but the estate to which it is due has been divided.
“How does this division of the dominant estate affect prescription of the servitude? It is clear under Article 801 that, prior to the division of the estate, exercise of the right of passage by either B or C would bar prescription as to the other. It is likewise clear under Article 803 that after the division of the dominant estate the use B makes of the servitude will not preserve the servitude as to C, or vice versa. If B does not exercise the right of passage, he loses it for his portion of the dominant estate. This is true not because the servitude was divided but because the dominant estate was divided, and, under the plain provisions of the Code, after division of the domi *539 nant estate each owner has the burden of preserving the- right of servitude as to his-portion of the estate.
"It is true that Article 803 and Article 776 seem to be applicable only to a partition by the owners of the dominant estate, for they use the language that ‘When the estate to which the servitude is due ceases to be undivided, by means of a partition’ and ‘If the estate for which the servitude has been established, comes to be divided’. However, in our opinion, it would be illogical to say that the Code contemplates that separate owners of parts of the dominant estate could preserve the servitude for each other if the estate was sold in parts but could not preserve it for each other if the dominant estate was partitioned by the co-owners; therefore the effects in the assumed case would obtain if B, the owner of a dominant estate, had sold a portion to C.
“We now apply the assumed case and the articles of our Civil Code applicable thereto, by analogy, to the case at bar. In doing so it follows that R. P. Bond, who granted the mineral servitude, is in the position of A, the owner of the servient estate, and S. C. Clark is in the position of B, the owner of the dominant estate in favor of which the servitude was granted. I. R. Bordages (Toklan Royalty Corporation by mesne conveyances) is in the position of C, to whom part of the dominant estate was sold. Clark must take the position of the dominant owner, and his act of selling to Bordages all of the mineral rights acquired by him on a portion of the area subject to the servitude must be analogous to B’s sale of part of the dominant estate to C. By analogy, what Clark did was to divide the dominant estate; he did not divide the servitude, for Clark and Bordages still had the whole right to explore for minerals. Clark by his act of sale merely limited the place on which each could exercise that right. Clark and Bordages, by analogy, became owners of portions of the dominant estate, and it follows that each must preserve the right to his portion or limited area, or he loses it under Article 803, Paragraph 1, of the Civil Code.
******
“From this it can be readily seen that the decree originally rendered in this case in first hearing has in no way destroyed or affected the rule or proposition of law that a servitude is indivisible. In other words, the servitude was not divided by Clark’s sale to Bordages, and it was not divided by the court’s decree that Toklan Royalty Corporation’s right had prescribed although Clark’s right still remained in full force and effect.” (Emphasis supplied.)
Applying the foregoing pertinent articles of the Code by analogy to the facts of this case, as was done in the foregoing *541 case, it cannot be said the' 1949 servitude created in favor of Group One was divided. Since it is 'only to the extent that it is necessary to protect, conserve and replenish the natural resources of this State and to prevent their waste that one’s right to property, either as owner or' under' contract, must yield to the Commissioner’s power, it necessarily follows that the only effect -the Commissioner’s Orders of 1959 creating Unit No. 2 had was to deprive Group One of their right to go upon the land and conduct drilling operations on that particular portion of the parent tract included in the unit; but these Orders did not deprive or in any way conflict with Group One’s right of ownership or any benefits flowing from the wells drilled on the parent tract.
We therefore conclude the good faith drilling operations on the parent tract in Unit 2 had the effect of interrupting the running of prescription on the entire tract, just as if there had been no compulsory Commissioner’s unit in existence.
For the reasons assigned, the judgment of the Court of Appeal, Third Circuit, is reinstated and made the final judgment of this court.
HAMITER, J., concurs in the result.
SUMMERS, J., dissents and assigns reasons.

. This was a family corporation composed of members of the opposing groups.

. “A. That certain lot of ground situated in the Town of Abbeville, Louisiana, on the East side of Bayou Vermilion, irregular in shape and being the real estate upon which the present syrup mill is now located, together with the mill thereon and all other buildings, warehouses, machinery and equipment pertaining thereto, and located on or attached to the said propery and/or said improvements.
“B. That certain tract of land containing 135 acres, more or less, located in the Third Ward of Vermilion Parish, State of Louisiana, with all buildings and improvements thereon situated or thereto appertaining, and being the same property described in • deed recorded in Volume 122 of Conveyances, at page 121, under the original Entry Number 56086, records of Vermilion Parish, Louisiana.
“C. Another tract of land containing 34.6 acres, more or loss, located in the Third Ward of Vermilion Parish, Lou- ■ isiana, with all of the building's - and improvements thereon situated and thereto appertaining, and being the same property described in deed recorded in Volume 108 , of Conveyances, at page 3S1, under Entry Number 50348, records of Vermilion Parish, Louisiana.
“D. Another tract of land containing 212 acres, more or less, located in Vermilion Parish, Louisiana, being the same property described in deed recorded in Volume 114 of Conveyances, at page 279, under Entry Number 53226, records of Vermilion Parish, Louisiana.
“E. That certain tract of land lying and being situated in the Third Ward of Vermilion Parish, Louisiana, on the East side of Bayou Vermilion, containing 235 arpents, more or less, (199.75 acres), lying in irregular Section 41, Township 12, South, Range 3 East and in irregular Section 45, Township 12 South, Range 4 East, and bounded on the North by estate of Joseph Eustache LeBlane; East by Public Road; South by lands of Cleo-mere Hebert or assigns; Cálice Trahan, and Dr. M. A. Young; and West by Bayou Vermilion and lands of Dr. M. A. Young, being the same property acquired from Bank of Abbeville and Trust Company in deed recorded in Volume 138 of Conveyances, at page 431, under Entry Number 66535, records of Vermilion Parish, Louisiana.”

. These claimants are Daisy Steen Morgan and Myrtle Steen Robertson.

. J. Wesley Steen claims individually and as administrator of the estates of Wesley Wilson Steen and Margaret Prances • Steen, his minor children. The other claimants are Albert C. Steen and Lillian B. Steen Derveloy.

. In order to facilitate the understanding of ther-problem posed by this litigation, a plat is attached hereto portraying the Mill Property as affected by the several orders of the Commissioner, and lies between points numbered 1 through 16 to 1.
LEGEND:
1 through 16 to 1 Property lines of C. S. Steen Syrup Mill, Inc.
1, 2, 12, 13, 14, 15, 16, to 1 Limits of the 1949 servitude included in the unit lished by Order Nos-. 447 and 447-B. estab-
A, B, C, D, to A Perimeter of D-l Sand Unit 2 established by. Order No. 447 & “A” Sand Unit established by • . Order No. 447-B.
Perimeter of Stansbury Sand (Fault Segment “A’.’) Unit established by Order No. 447-D.
Perimetci- of A-l Sand (Fault Segment “A”) Unit established by Order No. 447-B-l.
////////// Productive limits of 1949 servitude in dispute.

. The land included in this unit is between points A, B, 0, D to A on the plat.

. Points numbered 1, 2, 12, 13, 14, 15, 16 to 1 delineate the limits of the 1949 servitude included in unit established by Order Nos. 447 and 447-B.

. The perimeter of this unit is designated by an unbroken line.

. The perimeter of this unit is shown by a broken line.

. Article VI. Section 1(D) of the Constitution of 1921, as amended.

. These articles provide:
“Art. 776. If the estate for which the servitude has been established, comes to be divided, the servitude remains due for each portion, provided that no additional burden accrue thereby to the estate which is subject to the servitude.
“Thus, for instance, in case of a right of passage, all the owners are bound to exercise that right through the same place.”
“Art. 789. A right to servitude is extinguished by the non-usage of the same during ten years.”
“Art. 801. If the estate in whose favor the servitude is established belongs to several and has never been divided, the enjoyment of one bars proscription with respect to all.”
“Art. 803. When the estate to which the servitude is due ceases to be undivided, by means of a partition, each of those who were the eoproprietors, only preserved the servitude by the use he makes of it, and the others lose it by non-usage during the time required for prescription.
“If a servitude be due to several persons, but on different days, as the right of drawing water, he who does not exercise his right, loses it, and the estate subject to the servitude becomes free from it, as respects him.”