414 So.2d 1346 (1982)
ALLIED CHEMICAL CORPORATION, Plaintiff-Appellee,
v.
George J. DESPOT, Individually and As Trustee of the George J. Despot Trusts, et al., Defendants-Appellants.
No. 14876.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1982.
*1347 M. Thomas Arceneaux, Shreveport, for defendant-appellant, George J. Despot.
Liskow & Liskow by James L. Pelletier and George H. Robinson, Jr., Lafayette, for plaintiff-appellee, Allied Chemical Corp.
Goff & Goff by A. K. Goff, Jr., Ruston, for defendants-appellants, Norman Lamar Dowling and Dhu Dowling.
Before PRICE, JASPER E. JONES and SEXTON, JJ.
PRICE, Judge.
This suit presents a dispute between George J. Despot individually and as trustee of the George Despot Trust No. 1 through 11, and Norman Lamar Dowling and Dhu Dowling concerning the ownership of royalty proceeds allocated from unit production to land described as NW ½ of SE ¼ of Section 29, Township 19 North, Range 4 West in Lincoln Parish. Allied Chemical Corporation deposited $21,503.89, which represents a 3/96 royalty interest in the above described land, into the registry of the court. It was stipulated that Allied had previously paid the Dowlings $19,116.27 on production attributable to this interest. After motions for summary judgment were filed by both parties, the trial court granted a summary judgment in favor of the Dowlings. It held that any interest owned by Despot in the disputed tract had been extinguished by 10 years liberative prescription. The judgment provided that Allied was to be paid $19,116.27 from the funds on deposit with the remainder to be distributed between the Dowlings. Despot appeals, and we affirm.
On March 31, 1954, the Dowlings sold to George G. Despot 1/6 of the oil, gas, and other minerals in and under that might be produced from the following described land:
The Southeast Quarter of the Southeast Quarter of Section 20; the Northeast Quarter, the Southeast Quarter of the Northwest Quarter, the South half of the Northeast Quarter of the Northwest Quarter, and the Northwest Quarter of the Southeast Quarter of Section 29; all in Township 19 North, Range 4 West, containing 300 acres more or less, in Lincoln Parish, Louisiana.
In the sale of the mineral interest, the sellers reserved the right to grant future leases.
On September 15, 1955, George G. Despot, the Dowlings, and other mineral and royalty owners entered into a voluntary unitization agreement covering a portion of the tract described above. The voluntary unit did not include the disputed tract. Paragraph three of this agreement provides:
For the purpose of this Agreement, the mineral and royalty interests and the leasehold interests of the parties hereto as to the lands lying within the area above described are hereby pooled, unitized and consolidated. Drilling, mining or reworking of the Dorothy Dowling # 1 Unit, or production of any minerals from any part of the said consolidated area, pooled hereby, shall be treated for all purposes as operations upon or production from each of the above described leases. Lessees shall not be required to offset any well drilled on the Dorothy Dowling # 1 Unit by drilling any other well in said consolidated area.
On May 1, 1957, the Louisiana Commissioner of Conservation issued Conservation Order No. 370 creating drilling and production units for the "D" sand of the Terryville Field. In addition to other units, the order provided a unit containing the same land as the unit described in the voluntary pooling agreement.
A unit well, designated as Dorothy Dowling No. 1, was drilled on property in the S ½ of Section 20, Township 19 North, Range 4 West, but not on any of the tract described *1348 in the act of mineral sale from the Dowlings to Despot. Production from this well was obtained within 10 years from March 31, 1954, and is still producing.
On November 24, 1965, George G. Despot donated all of his mineral interest, including that covering the disputed tract, to George J. Despot, as trustee of the George Despot Trust No. 9. As George G. Despot had previously conveyed a 1/24 mineral interest in the property to Rena Marie Roberts, the donation covered only a 3/24 interest in the minerals. Although made a defendant in this suit, Roberts did not contest the proceedings or appeal the judgment.
On December 7, 1976, the Dowlings granted an oil lease covering the disputed tract and other land to Frank D. Rippey. The lease provided for the payment of 3/16 royalty to the lessors. In February 1979 production was obtained from the well drilled on the disputed tract. It is the royalty due from this well that is involved in this concursus proceeding.
Despot contends that because of the provisions of the voluntary unitization agreement, the production from the Dorothy Dowling No. 1 has interrupted prescription on all servitudes and royalty interests affecting lands located within the unit, and since a mineral servitude or royalty is indivisible this interruption is also effective as to the disputed tract herein which is outside of the drilling unit.
The Dowlings contend that prescription was not interrupted or suspended by the execution of the voluntary pooling agreement, the creation of the compulsory drilling unit or the drilling and production from the Dorothy Dowling No. 1 well.
The trial judge in excellent reasons for judgment, concisely stated the legal positions of both parties and reviewed the applicable law and jurisprudence in concluding that prescription had not been interrupted or suspended on the disputed tract. As we agree with the legal analysis and conclusions reached, we find it appropriate in this instance to quote the pertinent portions of the trial courts' reasons as follows:
"The question presented by this suit is whether liberative prescription has accrued as to the mineral or royalty interest created by the sale on March 31, 1954 by the Dowlings to Despot as relates to NW ½ of the SE ¼ Section 29, Township 19 North, Range 4 West. The question or issue in the suit is easy to identify. However, the correct result is more difficult to formulate from the statutes and the jurisprudence.
"As noted the Dowlings, in the sale to Despot, reserved the right to execute future leases. This reservation makes it a little difficult to identify the interest acquired by Despot as a mineral interest or a royalty interest. Fortunately, all of the parties agree that the same result is reached regardless of the `title' given to the interest created by the sale. The court prefers to refer to the right as a mineral interest with the Dowlings being vested with the executive rights covering the mineral interest. This is apparently the manner in which the parties treated the transfer as it appears to be the sale of a mineral interest.
"Article 37 of the Mineral Code (R.S. 31:37) reads as follows:
`Production from a conventional or compulsory unit embracing all or part of the tract burdened by a mineral servitude interrupts prescription, but if the unit well is on land other than that burdened by the servitude, the interruption extends only to that portion of the servitude tract included in the unit.'
"Learned counsel for the Dowlings contends that the provision of Article 37 relative to interruption of prescription is applicable to this case. Reasons are advanced in the brief and a number of cases cited which deal and relate to matters of prescription as procedural in nature being applied retrospectively. However, consideration must be given to Article 4, Section 15 of the Louisiana Constitution of 1921 and also to Article 214 of the Mineral Code (R.S. 31:214) which provides as follows:
`The provisions of this Code shall apply to all mineral rights, including those existing on the effective date hereof; but no provision may be applied to divest already vested rights or to impair the obligation of contracts.'
*1349 "Under the expressed provisions of Article 214 of the Mineral Code Article 37 and all other provisions of the Code are applicable to the mineral rights acquired by Despot from Dowling. However, the second portion of the article would mean that no provision would be applied to `divest already vested rights.' The ownership, if he had such, by Despot of a mineral interest affecting NW ¼ of SE ¼ of Section 29, Township 19 North, Range 4 West was certainly vested in the most realistic and legal sense of the word on January 1, 1975, the effective date of the Mineral Code. The Code then would be applied to the mineral interest owned by Despot on the effective date of the Code. The running or accruing of prescription against the mineral rights owned by Despot would be determined under the Code after its effective date. The legal effect would be the same as if the mineral rights in favor of Despot had been created on the date of January 1, 1975 and from that date forward, the provisions of the Code applied. Under this analysis the running of prescription would not be interrupted by the production from the Dorothy Dowling No. 1 after January 1, 1975. Prescription if not interrupted or suspended would accrue on January 1, 1985.
"In the case under consideration everything is uncertain. As previously mentioned it is not definitely determined if the sale by the Dowlings to Despot on March 31, 1954 was the sale of a mineral royalty interest or of a servitude with reservation of executive rights. Also, the effect of off tract unit production may depend upon the determination of whether the unit was a voluntary unit or an involuntary unit. The unit in the case under consideration was no doubt originally intended to be a voluntary unit by the agreement with the effective date of September 15, 1955. However, by Order No. 370 of the Commissioner of Conservation, the unit was created as an involuntary or compulsory unit and the boundary of the compulsory unit was identical with the boundary of the unit created by the pooling agreement. It would seem to be as certain as any proposition can be in the development of the mineral law of our state that if the unit is considered as a compulsory unit under Order No. 370 the drilling of the Dorothy Dowling No. 1 well did not interrupt the running of liberative prescription on that portion of the tract subject to the servitude outside the unit. In the case of Childs v. Washington, 229 La. 869, 87 So.2d 111 (La.1956) the Supreme Court of our state with Chief Justice Fournet, writing the opinion held that:
`It logically follows, therefore, that if the landowner and the mineral owner can by agreement extend the servitude as to a portion only of the acreage without by such act interrupting the tolling of prescription as to the servitude on the remainder of the tract, as held in Elson v. Mathewes, supra [224 La. 417, 69 So.2d 734 (1953)], and if the mineral owner can divide the advantages of a servitude by assigning to a third person all of his interest in a designated portion of the land affected by the servitude and create a situation whereby user of a portion would not hold the remainder, as held in Ohio Oil Co. v. Ferguson, supra [213 La. 183, 34 So.2d 746 (1946)], and Byrd v. Forgotson, supra [213 La. 276, 34 So.2d 777 (1945)], then clearly when the Commissioner of Conservation, acting for the State in the exercise of its police power, by his orders and after due hearing, included within a unit or units portions of a tract as to which owners had failed to agree to pool their interests for development purposes, his act produced the same result as if the parties had formed a drilling unit by convention and for development purposes had reduced the servitude to that extent' (Emphasis Added)
See also Jumonville Pipe and Machinery Co., Inc. v. Federal Land Bank of New Orleans, 230 La. 41, 87 So.2d 721 (La.1956) and Frey v. Miller, 165 So.2d 43 (La.App.3d Cir. 1964).
"The case under consideration could be resolved logically and correctly with the holding that the unit from which the Dorothy Dowling No. 1 produced, was a compulsory unit and that all leases, mineral sales, unitization or pooling agreements and any other type of conventional contracts were subject to the implied constitutional and *1350 statutory authority granted the Commissioner of Conservation. Under this analysis, it would not be necessary to consider the pooling and unitization agreement since the agreement was modified by the order of the Commissioner of Conservation. The order reduced the mineral right, whether royalty or servitude, to the extent that production from the Dorothy Dowling No. 1 was applicable only to the land in the production unit. The land outside the unit was not affected by the drilling or production. However, the court recognizes that it could also be argued that the order of the Conservation Commissioner did not nullify the conventional pooling agreement but only modified it to the extent that conservation of minerals dictated compulsory unit production.
"The case of Trunkline Gas Company v. Steen, 249 La. 520, 187 So.2d 720 (La.1966) presented a case where a well was drilled on a tract subject to a mineral servitude. A compulsory unit was established by order of the commissioner. The contention was made that this compulsory unit in effect divided the servitude and liberative prescription had run as to that portion of the tract outside the unit. The court in that case held that the creation of the compulsory unit did not affect the running of prescription on the entire tract and that the drilling interrupted as to the entire tract. In that case the court said:
`Applying the foregoing pertinent articles of the Code by analogy to the facts of this case, as was done in the foregoing case, it cannot be said the 1949 servitude created in favor of Group One was divided. Since it is only to the extent that it is necessary to protect, conserve and replenish the natural resources of this State and to prevent their waste that one's right to property, either as owner or under contract, must yield to the Commissioner's power, it necessarily follows that the only effect the Commissioner's Orders of 1959 creating Unit No. 2 had was to deprive Group One of their right to go upon the land and conduct drilling operations on that particular portion of the parent tract included in the unit; but these Orders did not deprive or in any way conflict with Group One's right of ownership or any benefits flowing from the wells drilled on the parent tract.
`We therefore conclude the good faith drilling operations on the parent tract in Unit 2 had the effect of interrupting the running of Prescription on the entire tract, just as if there had been no compulsory Commissioner's unit in existence.'
"The holding of Trunkline is not applicable in the case under consideration for the reason that the well, Dorothy Dowling No. 1, was not drilled on any part of the parent tract. However, the dictum statement in the Trunkline opinion could imply that after a voluntary pooling agreement, the creation of a compulsory unit would relate only to a matter of conservation and not to any matter relating to the term of leases, servitude or mineral royalty interest. If this analysis is correct then attention must be directed to the pooling and unitization agreement executed by the parties in this case.
"... The court is of the opinion that if you disregard totally Order No. 370 of the Commissioner of Conservation and consider the matter as if that order had never been issued, then it becomes a matter of determining if the holding of Elson, et al. v. Mathewes, 224 La. 417, 69 So.2d 734 (La. 1954) or the holding in Crown Central Petroleum Corporation v. Barousse, et al., 238 La. 1013, 117 So.2d 575 (La.1960) is applicable to the facts here presented. Admittedly, it certainly appears that Elson and Crown Central are inconsistent in their holdings. This was noted by counsel in the oral arguments and in the memorandums and also by the writer of the comments in the Mineral Code. A close study and examination of Elson and Crown Central is necessary to resolve the issue in the case under consideration.
"Elson presented to the court an issue to determine if liberative prescription of ten years had accrued on a mineral servitude. The servitude covered a ninety-one (91) acre contiguous tract of land. There was a voluntary pooling and unitization agreement executed that created a 640 acre unit. The *1351 unit created included forty (40) acres affected by the mineral servitude, but did not include fifty-one (51) acres. A producing well was drilled on land in the unit but not on the forty acres subject to the servitude. The question was whether the fifty-one (51) acre tract was burdened with the servitude or if the servitude had reverted to the landowner because of nonuse liberative prescription of ten (10) years. The Supreme Court in a unanimous opinion held that the servitude had prescribed as to that portion of the tract outside the unit....[1]
"The case of Crown Central Petroleum Corporation v. Barousse, supra, presented the question of whether production from a unit where the well was not on the parent tract interrupted liberative prescription on mineral royalty interest as to the entire tract or only as to the portion within the unit. Our Supreme Court in the cited case with two Justices dissenting held that under the voluntary pooling and unitization agreement in this case there was an interruption of the running of liberative prescription on the mineral royalty interest as to the entire tract. The court cited Elson and distinguished Elson on the basis that in Crown the unitization agreement did not reflect an intention by the royalty owner and the landowner to divide the royalty interest. Emphasis in the opinion was placed upon the fact that here there were royalty interests involved and that the owner of such interests occupied a different position from the servitude owner as he had no right to drill or explore for minerals.....[2]
"The holding in Crown has been questioned by writers and in subsequent opinions by our appellate courts. Admittedly, it is more than difficult to reconcile Elson and Crown. It should be noted that Crown did not overrule Elson. The court then must resolve the matter of the proper `yardstick' to use in the case under consideration. Obviously what appears to be the holding of Elson would lead to a contrary conclusion than application of what appears to be the holding in Crown. There is an excellent discussion of the holding of Elson and Crown in Exchange Oil & Gas Company v. Foster, 237 So.2d 904 (La.App. 1st Cir. 1970). The opinion reviewed the basic policies and factors to be considered in interpreting pooling agreements....[3]
"In the case under consideration, an examination of the pooling and unitization agreement shows that it is not the same as in Crown. For example in that agreement as quoted by Justice Hamiter in his dissent, there is recitation that production shall be considered as production `from all of the lands within the said unit and under all the leases affecting any portion of said land.' Whereas, in the pooling and unitization agreement under consideration the statement is made that the production of minerals `shall be treated for all purposes as operation upon or production from each of the above prescribed leases.' There is no mention or consideration that there is production from the land. Also, as mentioned above, Justice McCaleb stressed the fact that royalty interests were involved in Crown. In the case under consideration we have a servitude less executive rights. The case could then be decided by a holding that a mineral servitude is involved and accordingly Elson is applicable and not Crown relating to royalty. However, the court is of the opinion that the reasons for application of Elson rather than Crown are far more substantive than attempting a technical label on the real right mineral interest acquired by Despot on March 31, 1954.
"We must always begin on the premise that the parties are free to contract and if they do so they are bound by their agreement. There are obviously certain policy considerations to be considered in interpretation of the voluntary pooling agreements and in determining the intention of the *1352 parties. As relates to mineral or royalty interest one principal policy consideration of the jurisprudence has been an interpretation that is consistent with the running of liberative prescription against mineral servitude and mineral royalty interest.
"In some of the cases there is language about the intent of the parties to divide the servitude or royalty interest. The inquiry that is consistent with the total jurisprudence is an expression of intent to interrupt prescription on that part of the tract which is outside of the drilling or production unit. Intent must also be gathered and determined by what was contemplated by the parties under a reasonable interpretation of their agreement. When the unitization agreement is considered and tested by these guidelines, it appears and is obvious that Despot received everything that was contemplated at the time of the sale. There is no indication anywhere within the pooling and unitization agreement that the land outside the unit would be affected in any manner by the execution of the pooling agreement. Actually it was the same result as would have been obtained had the pooling agreement never been executed. There is no allegation in the answer by Despot that anything was done by the Dowlings to deliberately attempt to allow the accrual of liberative prescription by virtue of the fact that they had executive rights covering the mineral servitude.
"The court is of the opinion that if the unit comprising the S ½ of Section 20 and N ½ of Section 29 is regarded as being a compulsory unit that the drilling and production from the Dorothy Dowling No. 1 did not interrupt the running of liberative prescription on the tract involved in this suit. If you conclude that the unit was a voluntary unit then there was no intention on behalf of the parties to the pooling and unitization agreement to interrupt the running of prescription as relates to the property outside the unit."
On this appeal Despot contends the trial court was in error in its application of the alternative theories for finding prescription had accrued on the disputed tract. A considerable portion of appellant's brief is directed at the trial court's discussion of the effect of considering the Dorothy Dowling No. 1 unit a "voluntary unit" or a "compulsory unit," as these terms relate to the prescription issue. We do not find it necessary to discuss appellant's argument on this issue as we find the trial court reached the correct result by its alternate evaluation of the question under the assumption the compulsory conservation order had no effect on the previous pooling agreement. We believe the court was correct in finding the case of Elson v. Mathewes, supra, applicable to the circumstances here presented and in holding that there was no intention by the parties in executing the pooling agreement to interrupt prescription on the servitude tract lying outside the Dowling unit.
Appellant contends the trial court misconstrued the jurisprudence which holds that the advantages of a mineral servitude or royalty may be divided if the parties intend such a result. Appellant contends the execution of a voluntary pooling agreement in like manner to that done in this case, without any specific reference indicating an intent to do so by parties, does not ipso facto have the effect of dividing or reducing the servitude. We construe Elson to hold to the contrary. In clear language the majority in Elson v. Mathewes, supra stated:
Here, plaintiffs and the defendant, in the unitization and pooling contract, agreed to an interruption of prescription as to the 40-acre tract within the Dowling Unit, thereby extending the servitude as to it. However, the agreement made no mention of, and did not relate to, the remaining 51 acres (involved in this suit); and this omission along with the failure to drill on or otherwise use the 91 acres during the prescriptive period, resulted in 1947 in an extinguishment of the servitude to such extent.... (Emphasis Added)
Appellant also contends the trial court erred in not applying the holding in Crown Central Petroleum Corporation v. Barousse, 238 La. 1013, 117 So.2d 575 (1960) to the circumstances of this case. As pointed *1353 out by the trial judge the Crown case has been criticized in later appellate opinions and in several law reviews. Furthermore, the majority opinion in Crown ruled that it was distinguishable from Elson because a royalty interest was at issue rather than a mineral servitude. In the instant case although the trial court was reluctant to classify the interest, we clearly find it to be a mineral servitude. Although the Dowlings reserved the right to grant leases (the executive rights), their right to drill or search for minerals was not impaired. This is indicative of a mineral servitude. See Cormier v. Ferguson, 92 So.2d 507 (La.App. 1st Cir. 1957). Therefore, by the rationale employed in distinguishing Elson by the majority in Crown, that decision is not applicable to the instant case.
For the foregoing reasons and for the reasons assigned by the trial judge as quoted above which we adopt as the reasons of this court, the judgment appealed decreeing that liberative prescription has extinguished any rights of George J. Despot Trust Nos. 1 through 11 and of Rena Marie Roberts to any mineral interests in the NW ¼ of the SE ¼ Section 29, Township 19 North, Range 4 West, Lincoln Parish, Louisiana, and ordering distribution of the funds held in the registry of the court is affirmed.
Costs of this appeal are assessed to appellant.
NOTES
[1] An extensive quote from Elson v. Mathewes, 224 La. 417, 69 So.2d 734 (La.1953) is omitted.
[2] An extensive quote from Crown Central Petroleum Corporation v. Barousse, 238 La. 1013, 117 So.2d 575 (La.1960) is omitted.
[3] An extensive quote from Exchange Oil & Gas Company v. Foster, 237 So.2d 904 (La.App. 1st Cir. 1970) is omitted.