258 So.2d 531

Herbert BAKER and Mrs. Gertrude
Baker Paynter

v.

CHEVRON OIL COMPANY.

No. 51381.

Feb. 21, 1972.

Holloway, Baker, Culpepper, Brunson & Cooper, William H. Baker, Bobby L. Cul-

pepper, Jonesboro, for plaintiffs-appellants-applicants.

Madison, Files, Garrett, Brandon & Hamaker, H. Flood Madison, Jr., Monroe; Ford & Nugent, Howard N. Nugent, Jr., Alexandria, for defendant-appellee-respondent.

McCALEB, Chief Justice.

On March 29, 1956 Herbert Baker and his brother, Guy Baker, sold a sixty-acre tract of land, located in Section 4 T 18 N R 1W Lincoln Parish, to James V. and John M. Hinton, reserving to themselves (the vendors) a one-half mineral interest, in equal portions. Guy Baker died and his widow in community, Mrs. Gertrude Baker Paynter, is presently the record owner of one-half of his interest, or one-eighth of the entire minerals. His surviving daughters own the other one-eighth interest. The Hinton title was subsequently acquired by the Hinton Seed and Feed Store, Inc.

More than ten years after the sale of the property, Herbert Baker and Mrs. Paynter instituted this suit against Hinton Seed and Feed Co., Inc. and the Chevron Oil Co. seeking to have recognized as still outstanding the mineral servitude created by the reservation in the 1956 deed and to have cancelled a mineral lease covering this interest executed by Hinton in favor of Chevron.[1] Their suit was dismissed by

---

1. Guy Baker's heirs did not join as parties-plaintiff. However, they were cited by plaintiffs as parties-defendant.

the district court on a plea of liberandi causa for non-user. Judgment was affirmed on appeal. 245 So.2d 457. We granted certiorari. 258 La. 703, 247 So.2d 584.

There is little dispute as to the salient facts. It is conceded that no drilling or any other physical acts which might have interrupted prescription running against the Baker servitude were ever conducted on the Baker-Hinton property. However, in the latter part of 1965 the Wheless Oil Company, under a lease from R. Atley Donald, commenced drilling on *Donald's property* which is somewhat distant from the Baker-Hinton tract but in the same Section. After drilling to a depth of 9,000 feet without securing production, Wheless abandoned the well as a dry hole. Therafter, Chevron Oil Company undertook operations at its own risk, and on January 6, 1966 brought in a producing gas well.

In conformity with a condition of the drilling permit issued by the Department of Conservation, it was necessary for Chevron to form a production unit before it commenced actual, commercial production. After studying the situation, Chevron's Drilling Program Committee determined that all of Section 4 should constitute the unit, and it drew up multiple originals of a Voluntary Declaration of Pooling and Unitization Agreement, which were dated March 4, 1966 and distributed by Chevron to the other lessees of the property in the Section—Tenneco Oil Company, Southern Natural Gas Company and Wheless. In their respective leases, these companies and Chevron were authorized by their lessors to form a voluntary pooling agreement without further consent of the lessors. The leases covered all property within the Section except a one-half acre tract owned by the Lincoln Parish School Board on which there was no lease.

After legal procedures required for such leasing of public lands were complied with, Chevron, on March 4, 1966, acquired a lease on the School Board property, and on the same day the Board, through its President, signed a voluntary pooling agreement affecting its property in the section. Wheless also signed the unitization agreement for its lessors in the early part of March. The Court of Appeal found, however, that Tenneco Oil Company did not sign the pooling agreement until April 25, 1966 and Southern Natural Gas Company did not sign until April 14, 1966. Their declarations were acknowledged by Chevron on May 9, 1966. All the declarations, executed in counterparts, were filed in the conveyance records on May 12, 1966.

Despite the assertion to the contrary by plaintiffs, we are of the opinion that the record amply sustains the factual finding of the Court of Appeal that Tenneco and Southern did not sign the voluntary pooling agreement until the April dates indicat-

ed—more than ten years after the plaintiffs' mineral servitude was created.[2]

■ Inasmuch as no drilling operations or any other physical acts were conducted on the Baker-Hinton tract during the ten-year period, plaintiffs' mineral interest has expired, unless the forming of the voluntary unit containing both that tract and the Donald property (on which a producing well had been drilled within the ten-year period) effected an interruption of prescription.

The Court of Appeal correctly held that "Since the well was on property *other* than on the property in which plaintiffs claim a mineral interest, *unitization must have been completed prior to March 29, 1966*." (Emphasis added)

■ United Oil Company of California v. Touchet, 229 La. 316, 86 So.2d 50 (1956), which was approved in Viator v. Haynesville Mercantile Company, 230 La. 132, 88 So.2d 1, is full authority for the appellate court's resolution. For those cases make it clear that the legal execution of a unitization declaration *subsequent to the date on which prescription accrues cannot*

*have a retroactive effect,* so as to breathe life into an already expired servitude.

■ The instant case is even stronger than the two authorities cited. In those matters, the oil company's pooling declaration was filed in the public records before prescription accrued, *and included all of the land in the unit*. It was defective, however, in that the oil company did not have authority to pool one tract. It later acquired that right and thereafter refiled the declaration; but by that time the ten-year prescriptive period had passed. In the case at bar the unitization declaration *was not signed by all interests in the unit until after prescription had run,* and no declaration had been filed until after that date.

Therefore, because a legal unit had not been established on or before March 29, 1966, the ten-year prescription accrued, its course not having been interrupted by the drilling and production on land other than the Baker-Hinton tract.[3]

■ We are unimpressed with plaintiff's argument that R.C.C. Article 792 provides for a suspension of prescription in

2. This was established by the answer of plaintiffs to a "Request for Admissions" propounded by defendants. Moreover, both in its brief to the Court of Appeal, and in its application for certiorari, plaintiffs stated that whereas Wheless had executed the agreement prior to March 29, 1966, Tenneco and Southern had "executed after that date."

3. Because of our holding that all parties had not signed until after March 29, 1966, we pretermit the question of whether the effective date of such a declaration is delayed until the instrument is filed, even though all parties timely signed.

such cases as this one.[4] In this connection, plaintiffs' counsel state in their brief that:

"From the evidence herein, it is apparent that up through March 29, 1966, there was absolutely nothing that the Bakers could have done to protect their interest and to keep the ten year period from running. They could not execute another lease; they could not have gotten anyone to drill on the property in question, particularly since a producing gas well was in existence on January 6, 1966 which well, of course, would have been designated as a unit well."

It is immediately apparent that there was nothing to prevent drilling by plaintiffs' lessee on the Baker-Hinton tract until it had been validly unitized. As a matter of fact, it was not until after the well had been brought in as a producer that a determination was made as to just which properties would be included in the voluntary unit. It is true that *plaintiffs* could not drill or execute another lease, but this was because they themselves had previously executed a lease. *But there was no obstacle to their lessee's drilling on the property.* If plaintiffs had considered it expedient to drill on the tract they had a right to demand such action from their lessee. But clearly, a mineral servitude owner cannot

take the benefits derived from leasing his interest (bonuses, delay rentals, etc.) and then claim that the lease constitutes an obstacle to his drilling on the property. For, if the leasing of a mineral interest combined with failure of the lessee to develop the property constitutes an obstacle which could suspend the running of prescription on an outstanding mineral servitude, then such mineral interest could be kept in effect indefinitely by the simple expedient of arranging for a lease of the interest prior to its expiration.

■ Alternatively, the plaintiffs urge that if their mineral interest has prescribed, Chevron is liable to them for $15,000 for failing to timely establish the unit so as to protect their interest. This claim is based on the premise that an implied covenant of a lease is that "the lessee should do nothing to harm the interest of the lessor." And they argue that "The evidence herein shows that the defendants did not use due diligence to obtain the execution of the pooling agreement."

Conceding solely for purposes of discussion, that plaintiffs' premise is correct, the contention must fail as it does not appear from the record that Chevron held a lease from plaintiffs. To the contrary, the testimony establishes that Wheless was plain-

4. That Article reads: "If the owner of the estate to whom the servitude is due, is prevented from using it by any obstacle which he can neither prevent nor remove, the prescription of non-usage does not run against him as long as this obstacle remains."

tiffs' lessee. Therefore, Chevron was under no duty to rush the unitization through to protect plaintiffs' interest. In any event, our review of the record satisfies us that the Court of Appeal correctly found that the delays involved in completing the unitization were not caused by the negligence of Chevron.

For the reasons assigned, the judgment of the Court of Appeal is affirmed.