369 So.2d 1186 (1979)
Charles E. ROEMER, II, Plaintiff-Appellant,
v.
John E. CAPLIS, Jr., et al., Defendants-Appellees.
No. 13819.
Court of Appeal of Louisiana, Second Circuit.
March 26, 1979.
*1187 Mayer, Smith & Roberts by Paul R. Mayer, Shreveport, for plaintiff-appellant.
Bethard & Davis by Henry W. Bethard, III, Coushatta, for defendants-appellees John E. Caplis, Jr., Congregation of the Daughters of the Cross, Beatrice Caplis, Adolphe C. Renaud, Sr., Adolphe C. Renaud, Jr., William A. Renaud, Mrs. Ruth Renaud Gras and Commercial Nat. Bank in Shreveport.
Gordon, Arata, McCollam & Watters by John M. McCollam and Andrew L. Gates, III, New Orleans, for defendants-appellees Alexandrine Caplis Ryan and James J. Ryan, Jr.
*1188 HALL, Judge.
This declaratory judgment action involves the ownership of the minerals below 3100 feet under the Hopewell Plantation, a tract of land containing approximately 640 acres located in Bossier Parish. Plaintiff, Charles E. Roemer, II, is the present owner of the land, on which a producing well was drilled to a depth below 3100 feet in 1972. Defendants are members of the Caplis family, or their successors in title, who formerly owned the land which was conveyed to one member of the family in 1949 pursuant to a partition, and was eventually sold to Roemer in 1959.
Plaintiff's position essentially is that two separate mineral servitudes, one affecting the minerals above 3100 feet and one affecting the minerals below 3100 feet, were created in favor of the Caplis daughters by mineral sales in 1949, at which time the land was conveyed to one Caplis daughter. At that time oil was being produced from above 3100 feet and that production has continued until the present time. There was no drilling or production below 3100 feet until 1972. It is plaintiff's position, therefore, that the servitude affecting the minerals below 3100 feet created in 1949, and another servitude created in favor of his vendor when he bought the property in 1959, have prescribed, and that as landowner, he is the owner of all the minerals below that depth.
Defendants' position essentially is that only one servitude as to all depths was created by the 1949 instruments and that prescription against that servitude has continued to be interrupted by the continued production from above 3100 feet. Defendants contend Roemer owns only the fractional mineral interest he acquired from his vendor in 1959.
The district court, pursuant to written reasons for judgment, rendered judgment for defendants and plaintiff appealed.

I.
The Hopewell Plantation, along with other property, was owned by William A. Caplis and his wife, Hallie Mooty Caplis, as community property. Mrs. Caplis died in 1939, survived by her husband and seven children, two sons and five daughters, namely, John Edmond Caplis, William A. Caplis, Jr., Ruth Caplis, known as Sister Constance, Beatrice Caplis, known as Sister Miriam, Marguerite Caplis Renaud, Hallie Mae Caplis and Mrs. Alexandrine Caplis Ryan. Thus, in 1949, the property was owned in indivision one-half by Mr. Caplis, Sr. and one-fourteenth (1/14) each by the seven children, subject to their father's usufruct of their interest. The land was subject to three oil, gas and mineral leases and there was production of oil or gas from a depth above 3100 feet.
On March 1, 1949, four instruments, all dated January 29, 1949, were simultaneously filed of record, as follows:
(1) An instrument (identified in the record as Roemer-2) entitled "Mineral Deed" by which the father, two sons, and Mrs. Ryan conveyed to the other four daughters all of their right, title and interest in and to the oil, gas, sulphur and other minerals located above 3100 feet from the surface under the Hopewell Plantation containing 692 acres. The grant was made subject to any valid mineral leases affecting the property but included the royalties accruing under the leases. Mr. Caplis, Sr. renounced his usufruct in favor of the vendees. The stated consideration was $1,000 and other valuable consideration. The instrument contained the following recitation:
"The said above described lands being the same property as described in the deeds conveying the said Hopewell Plantation to the said Mrs. Alexandrine Caplis Ryan and to the said Miss Hallie Mae Caplis, said deeds being dated with this act and recorded on or about the same date as this instrument is recorded."
The instrument was signed by all members of the family.
(2) An instrument (identified in the record as Roemer-3) by which the father and two sons conveyed to the five daughters all their right, title and interest in and to the oil, gas, sulphur and other minerals lying *1189 below 3100 feet from the surface under the Hopewell Plantation containing 692 acres. The grant was made subject to any valid mineral leases affecting the land but included royalties accruing under said leases. Mr. Caplis, Sr. renounced his usufruct in favor of the vendees. The recited consideration was $1,000 and other valuable consideration. The instrument contained the same recitation concerning the sales to Mrs. Ryan and Miss Caplis as contained in the instrument identified as Roemer-2. All members of the family signed the instrument.
(3) An instrument (identified in the record as Roemer-4) entitled "Cash Sale" by which the father, two sons and four of the daughters conveyed to Mrs. Alexandrine Caplis Ryan the Hopewell Plantation containing 692 acres, less 52¼ acres being deeded to Hallie Mae Caplis. The deed did not contain language specifically reserving minerals, but did contain the following clause:
"This deed and transfer however is being made subject to all sales of minerals and royalties and rights pertaining thereto made this date by and between the parties hereto; and likewise it is being made subject to any oil and gas and mineral leases effecting said property which may have been heretofore made at any time."
The deed recited a consideration of $1,000 cash and other valuable considerations, "as per partition and agreement of settlement of this date between all parties hereto of the Succession effects and property of the late Mrs. Hallie Mooty Caplis, deceased, wife of said William A. Caplis, Sr., and mother of the remaining parties to this deed; the said William A. Caplis, Sr., joining in this deed and settlement to contribute to equalize and validate said settlement and allegations therein set forth." The instrument was signed by all of the family members.
(4) An instrument (identified in the record as D-10) entitled "Cash Sale" by which the father, two sons and four daughters conveyed to Hallie Mae Caplis a tract containing 52¼ acres out of the Hopewell Plantation. The deed contained the same clause relative to it being made subject to all sales of minerals and oil and gas leases and also contained a similar consideration clause referring to a partition agreement between the parties of the same date. The deed was signed by all of the family members.
By instrument dated November 7, 1955, recorded November 16, 1955, Mrs. Ryan donated the property to her son James Joseph Ryan, Jr. The act of donation recited that the property is subject to all sales of minerals and royalties and rights pertaining thereto and subject to any and all oil and gas and mineral leases affecting said property which may have been made at any time.
By instrument dated December 18, 1959, recorded December 28, 1959, Mrs. Ryan and James Joseph Ryan, Jr. sold the property to Charles E. Roemer, II. The deed contained the following mineral reservation:
"Vendors hereby reserve one-half of all their right, title and interest in and to the minerals in and under the property herein conveyed."
As previously mentioned, there has been oil production under the three old leases from a depth above 3100 feet from prior to 1949 to the present date. There was no drilling or production from a depth below 3100 feet until December 29, 1972, when a well was drilled which is now producing from below that depth.
This suit was filed by Roemer in 1976. Named as defendants are the five Caplis sisters or their successors in title. The defendants can be divided into two groups since their interest and legal positions are not identical: (1) the four sisters, Ruth, Beatrice, Marguerite and Hallie, and their successors; and (2) the fifth sister, Mrs. Ryan, and her son.
At trial, after plaintiff's objection was sustained, an unsigned carbon copy of a partition agreement purportedly executed by the Caplis family on January 29, 1949, the same date as the four instruments described above, was identified by the attorney who prepared it and the other instruments and by one of the sisters who signed it, and was filed into the record under an offer of proof. The instrument evidences *1190 an agreement by W. A. Caplis, Sr. and all of his children to make a partition and settlement of all the family property, including the Hopewell Plantation. The two sons had already received property. The instrument provided that the old home place located on the Hopewell Plantation, together with "surface rights" to 50 acres of land around it, should be deeded to Hallie Mae Caplis. Stocks and bonds and certain income producing property were to be conveyed to the four daughters other than Mrs. Ryan. Provision was made for income to be paid to Mr. Caplis, Sr. The "surface rights" to Hopewell Plantation, less the tract transferred to Hallie Mae Caplis, were to be conveyed to Mrs. Ryan. Pertinent to the mineral rights, the instrument provides:
"5. All royalties or royalty interests being received from production from any and all the oil and gas wells located on the said Hopewell Plantation, including any and all interest in any payments for gas, oil or other minerals now being received from production of said oil and gas wells; also any and all other mineral interests which may inure to the benefit of the said estate of the said Mrs. Hallie Elizabeth Mooty Caplis, located at a lesser depth than 3100 feet, shall be transferred by proper deeds or assignments, showing the proper consideration, to the said four daughters above named, not including the said Mrs. Alexandrine Caplis Ryan. Likewise any and all royalties or royalty interests or oil or gas payments of whatsoever nature which may be due and payable from any new wells or production therefrom which may be drilled to the same depths or sands from which the present wells are now producing, not exceeding 3100 feet from the surface, shall be transferred or assigned and made payable to the said four daughters, not including Mrs. Alexandrine Caplis Ryan; the said daughters however to give their said father a one-half (½) of the amounts of the royalties, etc., to be paid from said wells during his lifetime;
"6. All interest held by said Succession in and to all minerals located in and under the said Hopewell Plantation and located below the 3100' level or depth, shall be deeded and transferred to the said five daughters in equal proportions;"
The instrument further provides:
". . . and the said Caplis hereby grants, assigns and transfers with full subrogation of all rights unto his said four daughters,all the royalties, oil payments or other rights inuring to his benefits of, from and to, all oil or gas or other minerals now being or may hereafter be produced from all oil or gas wells, either or both, located on said Hopewell Plantation, and likewise from any future wells drilled to a depth not exceeding 3100 feet on said Hopewell Plantation, and he hereby agrees to execute proper assignments, transfers or deeds conveying said royalties or mineral interests just referred to, and as a consideration therefor, this transfer of royalties, etc., is being made subject to the payment to the said Caplis (therefrom) during his natural lifetime or amounts equalling one-half (½) of such royalties, oil payments, etc., received by the said four daughters;
"And the said William A. Caplis, Sr., further declares that he does by these presents renounce in favor of said five daughters all rights and interests he may have to the right or usufruct in and to any and all other minerals, oil and gas or production therefrom lying in and under said Hopewell Plantation at a depth in excess of or at a greater than 3100 feet from the surface thereof, and agrees to execute proper releases and relinquishments, assignments or transfers to the said five daughters of such royalties, mineral interests, etc., and he likewise as a consideration therefor shall be paid by the said assignees, during his lifetime only, amounts equalling to one-half of such royalties, oil payments, etc., that may be received from the said assignees from said minerals, oil and gas."
After the case was submitted the trial court reversed itself on the admissibility of the partition agreement and considered it in deciding the case. The trial court held that Roemer-2 was a sale of royalty above 3100 *1191 feet to the four sisters, that Roemer-3 was a sale of all minerals to all depths to the five sisters, subject to the four sisters' right to royalty above 3100 feet. The court found there was only one servitude created by Roemer-3 and that since the sisters' mineral interest extended to all depths, production from above the 3100 feet interrupted prescription as to all of their mineral interest. Consequently Roemer was recognized as the owner of only the one-half of onefifth (1/10) interest he acquired from the Ryans, the remaining mineral interest being vested in the Caplis family members or their successors in title. Specifically, the judgment recognized the minerals as being owned as follows:
(A) Congregation of the Daughters of the Cross, legatee of Ruth Caplis, known as Sister Constance, 1/5;
(B) Beatrice Caplis, known as Sister Miriam, 1/5;
(C) Heirs and legatees of Marguerite Caplis Renaud, 1/5;
(D) John E. Caplis, residuary legatee of Hallie Mae Caplis, 1/5;
(E) James J. Ryan, Jr., 1/10;
(F) Charles E. Roemer, II, 1/10.
The judgment recognizes that the mineral ownership is subject to the right of the four sisters or their successors in title (the first four parties named above) to all royalty received from production above 3100 feet in the proportions of ¼ each.

II.
On appeal plaintiff specifies the following errors:
(1) Receiving into evidence the unrecorded written agreement between the members of the Caplis family;
(2) Alternatively, considering the unrecorded agreement, in concluding that by its terms the parties intended to create and maintain a single mineral servitude, with a division of participation in the royalties between the members of the family derived above 3100 feet and that derived from below 3100 feet;
(3) Construing the intent of the parties to the instruments to the prejudice of plaintiff, an innocent third party purchaser, who had purchased relying upon the unambiguous terms of the recorded instruments;
(4) Separating the minerals from the fee in analyzing the ¼ each inherited interest of the children and treating it as a servitude that had been maintained on the entire tract to all depths;
(5) Holding that the inherited interest, fee and minerals, was not transferred by the deed from the family to Mrs. Ryan; and
(6) Failing to recognize and hold that separate instruments conveying minerals create separate servitudes and that in order to avoid the running of 10 years liberative prescription each must be exercised or used.
Plaintiff argues that two separate servitudes were created by the two mineral sale instruments. He further argues that since the deed from the other family members to Mrs. Ryan did not contain a mineral reservation by the four sisters who joined therein as vendors, the inherited one-fourteenth interest each of the four sisters was conveyed to Mrs. Ryan. Plaintiff further argues that the servitude created in 1949 in favor of the four sisters covering the minerals below 3100 feet terminated in 1959 because of non-use and that the servitude created in 1959 by the reservation contained in the sale from the Ryans to him terminated in 1969 because of non-use and that he, as landowner, now owns all the minerals below 3100 feet.
The four sisters group contends primarily that only one servitude was created in 1949. They argue first that "horizontal" servitudes, or servitudes as to separate horizontal strata, are not permitted under the Louisiana Mineral Code or jurisprudence. They argue secondly that there was no intent to create two servitudes, even if it can be legally done.
The Ryans support the position of the four sisters group. Alternatively, the Ryans contend, following plaintiff's theory that the four sisters' inherited interest in the minerals was not reserved and was conveyed *1192 to Mrs. Ryan, that Mrs. Ryan as landowner had fractional mineral rights both above and below 3100 feet, one-half of which was reserved in the deed to Roemer. Consequently, it is argued, production above 3100 feet has continued to interrupt prescription running against the Ryan interest and servitude, even if the servitude held by the four sisters below 3100 feet has been lost.

III.
The trial court erred in admitting the copy of the unrecorded partition agreement into evidence and in considering it in deciding this case.
Instruments relating to immovable property shall have effect against third persons only from the date of their deposit in the office of the parish recorder. LSACC Arts. 2246, 2254 and 2264. Such instruments which are not recorded shall be utterly null and void except between the parties thereto. LSA-CC Art. 2266. These provisions are clear and unambiguous and are enforced as written. McDuffie v. Walker, 125 La. 152, 51 So. 100 (1909). No instrument relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder, and neither secret claims nor equities nor other matters outside the public record shall be binding on or affect such third parties. LSA-R.S. 9:2721. The conveyance records are the only thing to which one dealing with real estate needs to look and third persons purchasing upon the faith of the public records are not bound by any knowledge except such as is disclosed by such records. Neither fraud nor want of consideration nor secret equities between the parties who have placed on the public records a title valid upon its face can be urged against a bona fide purchaser for value who has acted on the faith of such recorded title. Cole v. Richmond, 156 La. 262, 100 So. 419 (1924); Brewster Development Company, Inc. v. Fielder, 271 So.2d 299 (La.App.2d Cir. 1972), writ denied, 272 So.2d 695 (La.1973); Sklar Producing Co. v. Rushing, 262 So.2d 115 (La.App.2d Cir. 1972), writ denied, 262 La. 310, 263 So.2d 47 (1972); Hasslocher v. Recknagel, 160 So.2d 421 (La.App.2d Cir. 1962), writ denied, 245 La. 964, 162 So.2d 14 (1964); Jackson v. Golson, 91 So.2d 394 (La.App.2d Cir. 1956), writ denied (1957).
It is also the law that all persons have constructive notice of the existence and contents of a recorded instrument affecting immovable property, and where such an instrument contains language that fairly puts a purchaser on inquiry as to the title and he does not avail himself of the means and facilities at hand to obtain knowledge of the true facts he is to be considered as having bought at his own risk and peril. Hasslocher v. Recknagel, supra.
Defendants contend that the reference to the partition agreement in the deed to Mrs. Ryan constituted notice to the plaintiff of the existence of such an agreement and that he should have made inquiry concerning the agreement and, having failed to do so, took title subject to the agreement. Defendants further argue that the unrecorded partition agreement was properly admitted into evidence because the recorded instruments are vague and ambiguous, and the agreement was admissible to show the true intent of the parties. Defendants further argues that plaintiff had actual knowledge of the true intent of the Caplis family.
The reference in the deed to Mrs. Ryan to the partition agreement appears only as a part of the statement of the consideration for the conveyance to her. There is no language or indication whatsoever that the conveyance was made subject to any terms contained in a separate partition agreement. The reference does not even state that the partition agreement referred to is in writing. In any event, the partition agreement, even though referred to in the recorded instrument, is not itself recorded and insofar as third parties are concerned, has no effect. Sklar Producing Co. v. Rushing, supra. There was nothing about the reference to the partition agreement to excite further inquiry on the part of a subsequent purchaser.
*1193 Neither is the unrecorded agreement admissible to show the true intent of the parties to the 1949 instruments. The recorded instruments, although not artistically drawn or confected, are not vague and ambiguous and are subject to reasonable construction on the face of the instruments. The cases cited by defendants allowing parol evidence to be introduced to explain vague contracts in a contest between the parties to the contracts, and the cases cited dealing with notice that would affect a purchaser's good faith for purposes of acquisitive prescription, are not applicable to the case at bar which involves the right of a third party purchaser to rely on the face of the records. Plaintiff's actual knowledge of the parties' intent was not established by the evidence and, regardless, would not affect his right to rely on the public records.
Ownership of the immovable property in dispute must be determined from the instruments recorded in the public records. The four instruments filed on the same day at the same time and referring to each other obviously were part and parcel of one partition transaction concerning the Hopewell Plantation. All four instruments must be read together in order to determine what the parties intended to do and did.
Considering the four instruments of record, it is certainly perfectly clear that ownership of the 640-acre tract was conveyed to Mrs. Ryan. It is a fundamental rule of law that a conveyance of land carries with it all of the incidents of ownership, including mineral rights, except such rights as may be expressly reserved. Dillon v. Morgan, 362 So.2d 1130 (La.App.2d Cir. 1978); Herring v. Price, 4 So.2d 17 (La. App.2d Cir. 1941), writ denied (1941); Powell v. Roy, 14 La.App. 663, 130 So. 629 (2d Cir. 1930). Thus, Mrs. Ryan acquired full ownership subject only to any reservations or exceptions contained in the instruments, which must be construed together. The deed provides that the sale was made subject to the mineral sales executed the same date. Although "subject to" is not ordinarily language of reservation, when all four instruments are read together, it is clear that the parties intended that the rights granted in the two mineral sales were to survive the conveyance to Mrs. Ryan.
The first mineral sale instrument vested in the four sisters all mineral rights affecting the minerals lying above 3100 feet. The instrument was signed by the father, two sons and by Mrs. Ryan, as grantors. Mrs. Ryan granted to the four sisters all of her right, title and interest in and to the minerals above 3100 feet which clearly shows the intent that she was not to acquire any minerals above 3100 feet by virtue of the transactions. The conclusion made by the trial court that this instrument conveyed only a royalty interest, as distinguished from a mineral interest, is not warranted. The instrument is entitled a "Mineral Deed" and contains language customarily found in a conveyance of minerals or a mineral servitude. The language is identical to that contained in the other instrument conveying the minerals below 3100 feet to the five sisters. There is no basis for making a distinction between the nature of the interest conveyed by the two instruments.
The second mineral sale was signed only by the father and two sons as grantors and conveyed to the five sisters all of their right, title and interest in the minerals below 3100 feet. The rights conveyed by the father and two sons amounted to their 9/14 interest.
Thus, the only rights excepted from the conveyance to Mrs. Ryan were, (1) all mineral rights above 3100 feet conveyed to the four sisters by the first mineral sale, and (2) 9/14 of the mineral rights below 3100 feet conveyed to the five sisters by the second mineral sale. All other rights of ownership, including the remaining fractional interest in the mineral rights below 3100 feet, were vested in Mrs. Ryan by virtue of her land ownership.
This may not be what the Caplis family had intended, but this is what they did on the records and this is what they are bound by.
*1194 The remaining issue is whether the instruments created one servitude or two separate servitudes. Defendants argue first that Louisiana law does not allow the creation of separate servitudes as to separate horizons or levels, or so-called "horizontal" servitudes.
Defendants cite Gulf Oil Corporation v. Clement, 239 La. 144, 118 So.2d 361 (1960); Gunby v. Commercial Solvents Corporation, 170 So.2d 259 (La.App.2d Cir. 1964) and Article 68 of the Louisiana Mineral Code (LSA-R.S. 31:1 et seq.) in support of their position. Gulf Oil held that a mineral interest granted in a single instrument covering the whole of a tract of land creates a single servitude even though oil production from a depth under a certain portion of the land was excepted from the grant. Gunby held essentially that a single reservation of mineral rights on contiguous tracts of land creates a single servitude even though a certain part of the land was already subject to an outstanding mineral servitude. Article 68 of the Mineral Code provides that a single mineral servitude is established on a continuous tract of land notwithstanding that certain horizons or levels are excluded or the right to share in production varies as to different portions of the tract or different levels or horizons.
Those cases and the Mineral Code article permit the establishment of a single servitude under the circumstances involved in those cases and enumerated in the code article, and would allow the establishment of a single servitude under the situation existing in the case before the court. The cases and code article do not, however, prohibit the establishment of separate servitudes where an intent to create separate servitudes is evidenced by the instrument or instruments creating the mineral rights. Nor does any other law prohibit the creation of separate servitudes as to separate horizons or levels. Article 72 of the Mineral Code provides that the parties to an act creating a mineral servitude may alter the applicable legal rules subject to the limitations provided in Articles 73 and through 79. The articles referred to do not contain any prohibition against the creation of separate servitudes as to separate horizons or levels.
Implicit in Article 68 (which is essentially consistent with and a codification of existing jurisprudence; see GMB Gas Corp. v. Cox, 340 So.2d 638 (La.App.2d Cir. 1976) and comment following the article) is the concept that certain levels or horizons may be excepted from a mineral servitude, or that a mineral servitude may be created affecting less than all levels or horizons under a tract of land. It logically follows that separate servitudes may be created affecting separate levels or horizons.
Several cases decided prior to the adoption of the mineral code indicate that separate servitudes may be created as to separate depths. White v. Frank B. Treat & Sons, Inc., 230 La. 1017, 89 So.2d 883 (1956), held that a compulsory unit restricted to a particular zone or zones maintains the servitude as to all depths, since in that case the servitude was "not contractually restricted as to formations". In Goldsmith v. McCoy, 190 La. 320, 182 So. 519 (1938), the Louisiana Supreme Court held a mineral servitude restricted to below 300 feet had prescribed. Iberville Land Company v. Texas Co., 4 La.App. 221, 128 So. 304 (1st Cir. 1930), interpreted language reserving the soil under 500 feet as creating a mineral servitude to that depth, since Louisiana does not allow sub-surface estates in land. See also "The Louisiana Mineral Servitude and Royalty Doctrines, a report to the Mineral Law Committee of the Louisiana State Law Institute," by Eugene A. Nabors, 26 Tu.L.R. 23. There, on page 38, the author noted: "A restriction of a mineral servitude to specified minerals and provisions imposing depth limitations or making the servitude applicable to designated strata seem to be permissible forms of contracts. The decisions which apply liberative prescription to sub-surface estates by implication recognize the validity of depth limitations on mineral servitudes."
A mineral servitude is the right of enjoyment of land belonging to another for the purpose of exploring for and producing *1195 minerals and reducing them to possession and ownership. Article 21. We perceive no reason why a mineral servitude cannot be granted limited to exploration and production of minerals from a particular level or horizon. It follows that separate mineral servitudes may be granted to the same person, or to different persons, affecting separate levels or horizons. We hold specifically that Louisiana law permits the creation of separate servitudes as to separate depths, levels or horizons.
The question in this case narrows down to whether or not the instruments of record created one servitude or created two servitudes, one affecting the minerals above 3100 feet and the other affecting the minerals below 3100 feet. A very similar issue was presented in Whitehall Oil Company v. Heard, 197 So.2d 672 (La.App.3d Cir. 1967), writ denied, 250 La. 924, 199 So.2d 923 (1967), which dealt with mineral reservations contained in a partition in kind of a tract of land into contiguous tracts. The court in that case held that determination of whether the parties intended to create a single servitude or multiple servitudes depended upon construction of the particular conveyances. The court noted that it has been held that two separate deeds by the same landowner conveying mineral interests in two contiguous tracts of land create separate mineral servitudes although acquired by the same mineral owner, citing Cox v. Acme Land & Investment Co., 192 La. 688, 188 So. 742 (1939). Thus, whether the parties intended to create a single or multiple interests by a particular transaction must depend upon principles of contractual construction. The issue is to be decided in accordance with the intent of the parties as reflected by their agreement.
Another applicable principle of construction noted in the Whitehall Oil Company case is that where an instrument can be reasonably interpreted in more than one way the proper interpretation is that which least restricts the ownership of the land conveyed, as in the case of mineral servitudes. In Whitehall the court relied on the legislative mandate that "`Servitudes which tend to affect the free use of property, in case of doubt as to their extent or the manner of using them, are always interpreted in favor of the owner of the property to be affected.' LSA-C.C. Art. 753."
In our opinion, the recorded agreements in this case reflect an intent on the part of the parties to create two separate mineral servitudes. First of all, there are two separate grants or reservations contained in two separate instruments. Following the Whitehall Oil Company and Cox cases, this is strong evidence of an intent to create separate servitudes. Further, each grant covers entirely separate and distinct horizons or levels. Ownership of the mineral rights affecting the separate horizons or levels is different. The intent as evidenced by the instruments themselves was to create one servitude in favor of the four sisters affecting the minerals above 3100 feet and another separate servitude in favor of the five sisters affecting the minerals below 3100 feet.
It follows that production from the horizons affected by the first servitude would not interrupt prescription running against the second servitude. "Where there are distinct and separate servitudes, there must be development on each servitude to prevent the running of prescription against it, and the development of one of the servitudes, no matter how extensive, will not interrupt the running of prescription against the other servitude." Cox v. Acme Land & Investment Co., supra.
Since there was a separate servitude created in 1949 affecting the minerals below 3100 feet and since there was no use of that servitude during the ten years after its creation, it prescribed and terminated in 1959. The entire mineral rights below 3100 feet were vested in James J. Ryan, the landowner at that time. When Ryan sold the land to Roemer later in 1959, he reserved ½ of the mineral rights owned by him, creating a new servitude. There was no use of that servitude for a period of ten years, and it, therefore, prescribed and terminated in 1969. The mineral interest reverted to the then landowner, plaintiff *1196 Roemer. Plaintiff is entitled to be recognized as the owner of all the minerals or mineral rights lying below 3100 feet from the surface of the earth under the land owned by him.
For the reasons assigned, the judgment of the district court is reversed and set aside. It is ordered, adjudged and decreed that plaintiff, Charles E. Roemer, II, as owner of the following described land, towit:
N½ of SE¼ of Section 23 and woodland Lots 3, 4 and 5 and cleaned Lot 3 of the John L. Hodges Partition as recorded in Conveyance Volume 7, page 232 of the records of Bossier Parish; also cleaned Lot 4 of said partition, less 36 acres sold to L. K. Hodges by deed recorded in Volume 13, page 645 and less 26.79 acres sold to John S. Young by deed recorded in Volume 14, page 560; all being in Sections 23, 24, 25 and 26, Township 16 North, Range 12 West and being that property acquired by W. A. Caplis from the Merchants and Farmers Bank of Shreveport, Louisiana, by deeds recorded in Conveyance Volume 16, page 257 and Volume 19, page 72 of the records of Bossier Parish, Louisiana; less 2.1 acres sold to Bossier Parish School Board as per deed recorded in Volume 55, page 398 and less 9.87 acres sold to Bossier Parish School Board as per deed recorded in Volume 292, page 571, records of Bossier Parish, and less that certain tract sold to Hallie Mae Caplis described in deed dated January 29, 1949 and recorded March 1, 1949 in Conveyance Book 198, page 136 of the records of Bossier Parish, Louisiana, together with all batture, accretion and alluvian lands thereunto accruing and belonging, and all buildings and improvements thereon.
is the owner of, that is, has the exclusive right to explore and develop the said land for the production of and to reduce to possession and ownership, all of the minerals lying below 3100 feet from the surface of the said land described above.
Reversed and rendered.