MARVIN, Judge.
Plaintiff-landowners appeal a judgment declaring, contrary to their demands, that production from an oil and gas unit that contained 40 acres of a 120-acre mineral servitude interrupted the 10 year non-use prescription accruing against the 80 acres of the servitude that was not in the unit. The unit well is not on the servitude tract. We affirm. La.Mineral Code Art. 75. See and compare Elson v. Mathewes, 224 La. 417, 69 So.2d 734 (1953); Crown Central Petroleum Corporation v. Barousse, 238 La. 1013, 117 So.2d 575 (1960); and Allied Chemical Corporation v. Despot, 414 So.2d 1346 (La.App. 2d Cir.1982).
Plaintiffs’ ancestor, White, created the servitude on October 2, 1934, by selling one-half of the minerals underlying 120 contiguous acres (SE/4 of SW/4 of Sec. 18 and N/2 of NW/4 of Sec. 19, T15N, R6W, Bienville Parish) to defendants’ ancestor, Evans. In 1942 White leased this acreage with an additional 299 acres (369 total acres) to Placid Oil Company on a Bath’s Form 14-B lease. Four months later Evans executed a co-lessor’s agreement to Placid, expressly ratifying, joining, and concurring in the White lease as a co-lessor of the servitude of ½ the minerals on the 120 acres.
In 1943 and 1944 Placid and the respective owners of mineral interests in sections 18 and 19, T15N, R6W, executed voluntary pooling agreements separately creating a 640 acre unit in Section 18 and a 640 acre unit in Section 19. White and Evans separately signed the voluntary pooling agreements. Placid spudded in the Section 18 unit well in the NE/4 of the section on June 7, 1944. This well was not on the servitude property. The well was successfully completed and has since produced oil and gas. Section 19 was not drilled or explored.
The trial court did not hear witnesses. The record consists of a stipulation, the various instruments executed by the litigants’ ancestors, and demand letters. The trial court concluded that the language of the pooling agreements should be interpreted as intending to interrupt prescription against the contiguous 120 acre servitude tract, whether in or out of the Section 18 unit.
The landowners contend that the language of the two pooling agreements should have been interpreted as intending to divide the servitude. Elson, supra; Allied Chemical Corp., supra.
Where the written agreements of the servitude owner and landowner are silent as to the effect of production on the servitude, the basic rules of Arts. 33, 34, and 37 of the Mineral Code apply. Unit production other than on the part of the servitude tract within the unit interrupts prescription only on that part of the servitude tract within the unit. Art. 37. See Comment under Art. 75. The parties may agree expressly and in writing, either in the act creating the servitude or otherwise, that an interruption of prescription by unit production shall extend to the entirety of the servitude tract, wherever the location of the unit well and whether only part of the servitude tract is within the unit. Art. 75.
Prescription accruing against a mineral servitude may also be interrupted by the express acknowledgment of the landowner. This acknowledgment may be gratuitous or onerous, but it must be in writing, must express the intent to interrupt prescription, and must clearly identify the servitude that is acknowledged and the party making the acknowledgment. Arts. 54, 55.
The critical issue is whether this landowner and servitude owner expressly agreed in the pooling agreements or other writings, and contrary to the basic rule of Art. 37, that production from the unit *161 would interrupt prescription on the part of the servitude that was not contained in the unit. Art. 75.
The 1942 lease executed by White to Placid contained this typewritten provision that was initialed by White:
“Lessor agrees that any party owning an interest in ... the minerals underlying the property leased herein may ratify this lease and such ratification shall constitute an interruption of prescription li-berandi causa now running against the mineral interest then owned by the party so ratifying as of the date of this lease. This right of ratification may be exercised at any time during the first year of this lease or during any subsequent year of the primary term for which lessor has received delay rentals.”
The co-lessor’s agreement executed by Evans to Placid contained a similar typewritten provision that
“This ratification or co-lessor’s agreement is executed in consideration of the interruption, as of the date of the lease ratified herein, of prescription liberandi causa then running against the mineral interest owned by co-lessor. Co:lessor further agrees that all rentals under said lease shall be paid to lessor named therein, all as provided in said lease.”
The pooling agreements executed in 1943 and 1944 are apparently printed forms then used by Placid, to which are attached exhibits describing the leases that Placid owned which described acreage that included lands in sections 18 and 19 and elsewhere.
In the Section 18 unit, for instance, the pooling agreement recites in par. 2 that Tract B in the exhibit attached contains 369 acres (Tract B of the exhibit identifies the White lease and describes the 369 acres). Paragraph 2 also recites that the part of Tract B which is “embraced within the pooled premises” contains 43 acres (40 acres of the Evans servitude and three additional acres owned by White elsewhere in Section 18). The exhibit to the pooling agreement also expressly includes “eo-les-sor’s agreements ... executed in connection with any lease described herein.”
The pooling agreement for Section 19 contains an exhibit that describes Tract B in exactly the same language as the Section 18 pooling agreement exhibit, and states that the part of Tract B which is “embraced” in the Section 19 unit is 200 acres. The remaining 126 acres of the 369 acres described in the White lease are located in sections other than sections 18 and 19. The White lease, the Evans’ co-lessor’s agreement, and the pooling agreements were recorded on the public records. Each pooling agreement is an agreement not only between Placid and SECOND PARTY (the mineral owners in the particular section) but, as well, “between and among the parties who constitute SECOND PARTY.”
Under these circumstances, White should have known that prescription accruing against the Evans servitude would be interrupted if Evans chose to “ratify” the lease White executed to Placid. The lease expresses acknowledgment of this power in a typewritten paragraph that was initialed by White. See Arts. 54, 55. White also should have known that each pooling agreement distinguished between the acreage described in each tract (or lease) identified in the exhibit and the acreage of that description that was to be “embraced within the pooled premises.”
In this light, the pooling agreement clearly expresses that production from the “pooled premises” will interrupt prescription running against mineral rights on lands covered by the pooling agreement and on each and every tract covered by the oil and gas lease acreage described in the exhibit to the agreement.[1]
*162 The last clause of the paragraph quoted in footnote one (that payment of royalty or shut in royalty is a “new acknowledgment ... interrupting prescription as to all rights of all parties under all servitudes affecting the premises pooled herein”) does not limit, or make ambiguous, the express language we have emphasized. The agreement expressly recognizes that co-lessor’s agreements have been executed and that Tract B contains acreage that is not within the unit but which broadly “affects” the pooled premises.
The fact that two pooling agreements were separately executed by the landowner and the servitude owner to create one unit in Section 18 and another unit in Section 19 does not change our conclusion. Each pooling agreement mentioned and described as Tract B, the 369 acres that were described in the White lease. Each agreement mentioned that the part of that Tract B acreage “embraced in the pooled premises” was less than the 369 acres described in the lease description contained in the exhibit. Each agreement then stated that production from the unit would interrupt prescription accruing against mineral rights on lands covered by the pooling agreement and on lands or tracts covered by the leases and described in the exhibit. See quoted and emphasized language in footnote one.
The fact that each agreement contained the same language and the same description with regard to Tract B, the 369 acre White lease, indicates that production from one section would interrupt prescription accruing against mineral servitudes extending from that section into the other. The fact that Placid later “released” its lease in Section 19 does not persuade us to a contrary conclusion.
We shall not join and add to the many comparisons of the cited cases and others that touch on the issue and that construe and distinguish similar agreements. See e.g., Williams and Meyers, Oil and Gas Law, §§ 963.3 and 964, and Mineral Law Primer, 50 Tulane L.R. 732, at 781 (1976). The ease law appears to have been codified insofar as it was possible to do so in the principle of Art. 75: The landowner and the servitude owner “may agree expressly and in writing, either in the act creating a servitude or otherwise, that an interruption of prescription shall extend to the entirety of the tract burdened by the servitude regardless of the location of the well or of whether all or only part of the tract is included in the unit.” See also 50 Tulane L.R. 781, note 347. We hold that the pooling agreement in question expresses such an agreement as Art. 75 contemplates.
For the reasons assigned by the trial court, as here supplemented, and at appellants’ cost, we AFFIRM the judgment.

. We quote and emphasize the pertinent language:
"NOW, THEREFORE, IT IS AGREED by and between PLACID and SECOND PARTY and between and among the parties who constitute SECOND PARTY as follows: * * *
"2. For the purposes of this contract, it is agreed that the individual tracts described in Exhibit “A." contain exactly the following acreage:
"Tract “A" contains 9983 acres

“Tract "B" contains 369 acres

*162 "Tract "C" contains 80 acres ...
"That the entire pooled premises described as follows, to-wit:
“Section 18 Township 15 North Range 6 West in Bienville Parish, Louisiana, contain exactly 640 acres of land, whether there be more or less; and that that part of each of the individual tracts described in Exhibit "A ” which is embraced within the pooled premises contains exactly the following acreage:
"That part of Tract "A” contains 517 acres

"That part of Tract “B" contains 43 acres

"That part of Tract "C” contains 80 acres
"It is further agreed that ... production on any part of the pooled premises shall constitute an interruption of prescription Iiberandi causa then running against the ... mineral rights ... owned by any of the parties constituting SECOND PARTY in and to all of the lands covered by this pooling agreement and as to any and all other lands covered by any and all of said leases and so long as there may be production of gas from any portion of the premises pooled herein or so long as royalty in lieu of such production shall be paid in accordance with the terms of this agreement, the same shall constitute an interruption of the running of prescription Iiberandi causa applicable under the law of the State of Louisiana to mineral servitudes and each monthly payment of any of the royalties or royalties in lieu of production hereunder shall be considered and accepted by all parties constituting SECOND PARTY as a new acknowledgment made for the purpose and intent of interrupting said prescription as to all rights of all parties under all servitudes affecting the premises pooled herein.”