NORRIS, Judge.
This is a concursus proceeding. At stake is the ownership of minerals that underlie a 60-acre portion of the 260-acre “Scott Tract” in Webster Parish. The trial court found that although the title was burdened of record with a mineral servitude, ten years of nonuse had elapsed, thus unifying the surface and mineral estates. The appellants here are a group of mineral claimants who derive their title from the original servitude owners. Not all the mineral *935 claimants have appealed. The appellees are the surface owners, who prevailed at ■trial. For the reasons expressed, we affirm.
Before 1936, Robert Scott owned the tract, both surface and minerals. In 1936, however, he created a mineral servitude by conveying an undivided one-half mineral interest each to E.C. Yeates and A.S. Drew. At about the same time, Mr. Scott granted a mineral lease covering the entire tract to the same E.C. Yeates. On the strength of this lease, which had a ten-year primary term and no Pugh clause, the subsequent lessees drilled two wells on the Scott Tract in 1940. These wells produced briefly before being plugged and abandoned. The Pruitts, James T. and his son James H.,[1] bought the surface in 1944. They took possession and have enjoyed continuous, uninterrupted possession ever since. Much later, in 1954, a third well was drilled on the Scott Tract.
Considering the on-tract activity alone, it is obvious that ten years of nonuse of the mineral servitude elapsed between the plugging of the first two wells and the drilling of the third. The first well, the Scott No. 1, was permitted in March 1940, produced for about nine months, and was ■ plugged and abandoned in December 1941. The second well, the Scott No. 2, was permitted in May 1940 and seems to have produced for only three months. Its plug and abandon permit is dated July 1942. The third well, the -Scott-Childs No. 1, was not permitted until August 1954, over twelve years later. Ten years of nonuse extinguished the mineral servitude and the mineral rights reverted to the surface owner. LSA-R.S. 31:27; LSA-C.C. art. 3448.
At trial, appellants tried to show that Scott Nos. 1 and 2 actually were in production between 1942 and 1954, thereby interrupting prescription. They offered the testimony of Mrs. Connally, who is A.S. Drew’s widow. She testified that she received royalty checks constantly since 1941 and felt certain they were derived from the Scott Nos. 1 and 2 wells. But her testimony, coming from informal records and unsubstantiated by any agent of the mineral lessee, was double hearsay. Mrs. Connally was unaware that her royalties could have flowed from unit production rather than well production; nor had she ever visited the tract and seen the wells. In opposition was the direct testimony of James H. Pruitt, who had farmed the tract since he bought it, and his son James S. Pruitt, who had farmed the land for his folks as long as he could remember. They said there were positively no producing wells or drilling activity on their land until the Scott-Childs No. 1 in 1954.
Appellants further contend that the files at the Office of Conservation do not conclusively show that Scott No. 2 was ever finally plugged. But the files do show a plug and abandon permit as well as production records which ceased in March 1942. Viewing all this evidence, the trial court concluded that Scott No. 2 had ceased production in 1942 and that no further operations occurred on the tract until 1954. This finding is not manifestly erroneous and we affirm it.
If the only issue were on-tract production, then this conclusion would completely dispose of the case. There is, however, an extensive history of unitization and drilling on adjacent tracts.
In the early stages, there were several voluntary pooling agreements that grouped together small portions of the Scott Tract with small, contiguous portions of adjacent tracts. None of these agreements, however, affected the 60 acres at issue. In addition, in 1941 and 1942, there were two compulsory unitization orders that grouped small portions of the Scott Tract with the *936 very large Bodcaw and D Sand units. Once again, neither of these orders covered the 60 acres at issue. The Scott Tract seems to be located on the edge of the Bodcaw and D Sand units, and the 60 acres at issue were simply outside their borders.
The 60 acres at issue were not unitized until 1978, when Sandefer & Andress drilled the well that provoked the instant suit. The mineral claimants provided evidence of three wells drilled in the adjacent Bodcaw and D Sand units between 1939 and 1949. The facts concerning these wells were close, and the trial court did not clearly say which of the wells he considered to have been in production. The first was the Gaines No. 1. It was permitted in December 1939 and produced through 1942, when production records stop. There was, however, no permit to plug and abandon; furthermore, the well was “recompleted” in 1954, with a considerable gas potential. Although complete production figures are not in the record, there was a suggestion that Gaines No. 1 was still producing at the time of trial in April 1981. The next two wells were Gaines No. 2 and Gaines No. 3. They were drilled in 1947 and 1949 respectively. The Office of Conservation files show that these wells were drilled in the Hill Zone Unit, another nearby unit that does not underlie any of the Scott Tract. Even though Gaines No. 2 and Gaines No. 3 are both situated over land included in Bodcaw, the Office of Conservation expert testified that these wells reached only into the relatively shallow Hill Zone Unit, not deep enough to penetrate Bodcaw or D Sand depths.[2]
We do not understand why the mineral claimants placed so much stress on the Gaines wells. Gaines Nos. 2 and 3 were simply not deep enough to create a user of the Bodcaw Unit. LSA-R.S. 31:29(1); Roemer v. Caplis, 369 So.2d 1186 (La.App. 2d Cir.1979), writ denied 371 So.2d 620 (La.1979). And Gaines No. 1 appears to have been abandoned in 1942; an unused, potential well cannot interrupt prescription until its potential is proven, and this well’s potential was not proven until years after prescription had accrued. LSA-R.S. 31:34. In sum, the evidence from these wells is tenuous and inconclusive at best.
There was, however, other evidence. On the second day of his testimony, the expert from the Office of Conservation testified that there had been continuous production in the Bodcaw and D Sand units since their inception and that hundreds of wells were still producing there today. This was corroborated by an adjacent landowner, a Mr. Stewart, who said that Cotton Valley, the field in which Bodcaw and D Sand are situated, has been in production continuously since 1941. This testimony leads us to conclude, with the trial court, that Bodcaw and D Sand have produced continuously since 1941 despite the unclear evidence from the Gaines wells.
The residual question, therefore, is whether operation or production on a unit will interrupt prescription on part of a servitude tract not included within the unit. The Mineral Code clearly holds that operation or production on a unit interrupts prescription on that unit but not beyond. LSA-R.S. 31:33, 37. None of the units affected by off-tract activity underlay the 60 acres presently at issue. See Allied Chemical Corp. v. Despot, 414 So.2d 1346 (La.App. 2d Cir.1982); Elson v. Mathewes, 224 La. 417, 69 So.2d 734 (1954).
It is hardly necessary to reiterate the reasons for the apparent “servitude splitting” provided for in the Mineral Code. Unlike predial servitudes, mineral servi-tudes depend on the integrity of underground units or “pools.” Pools take precedence over arbitrary surface boundaries. See the extensive discussion in Allied Chemical Corp. v. Despot, supra; Frey v. Miller, 165 So.2d 43 (La.App. 3d Cir.1964) (on rehearing), writ denied 246 La. 844, 167 So.2d 669 (1964).
Appellants assert that the courts did not always agree on this analysis. See Ohio *937 Oil Co. v. Kennedy, 28 So.2d 504 (La.App. 2d Cir.1946), writ denied; Crown Central Petr. v. Barousse, 238 La. 1013, 117 So.2d 575 (1960). In an attempt to profit from this confusion, appellants argue that-the law in force when they acquired their rights clearly held that the servitude burdening a “parent” tract was not divisible and that if any part of the parent tract was saved from prescription, then the whole was likewise saved. See LSA-C.C. art. 656 (1870); cf. LSA-C.C. art. 652 (1977).
This argument is untenable. Far from holding clearly in appellants’ favor, the old jurisprudence tended to reach this conclusion only after travelling through an intricate labyrinth of distinctions now disregarded, such as mineral rights and royalty interests, and always guided by the law of predial servitudes. By contrast, even early-cases allowed the splitting of mineral servitudes. See Spears v. Nesbitt, 197 La. 931, 2 So.2d 650 (1941). The correct rule to emerge from the jurisprudence is that embodied in the present Mineral Code. See Allied Chemical Corp. v. Despot, supra; Childs v. Washington, 229 La. 869, 87 So.2d 111 (1956).
We further note that the Mineral Code is a codification and clarification of the law in force prior to the Code’s 1975 enactment. This court has held that the Code is retroactive when it serves the remedial function. GMB Gas Corp. v. Cose, 340 So.2d 638 (La.App. 2d Cir.1976). This is such a case.
Appellants raise the further argument that a voluntary pooling agreement may expressly provide that operations or production on a voluntary unit will interrupt prescription as to any affected servitude tract in its entirety. This is correct. LSA-R.S. 31:75; R.S. 31:37, comment; White v. Evans, 457 So.2d 159 (La.App. 2d Cir.1984), writ denied 462 So.2d 207 (La. 1985). We have carefully examined all the early voluntary pooling agreements and we have found no clause, no language, and no intimation that the parties intended the blanketing effect appellants now seek. Examples of language that could do so can be found in White v. Evans, supra, fn. 1; Crown Central Petr. v. Barousse, 238 La. 1013, 117 So.2d 575, at 581 (Hawthorne, J., dissenting). The evidence in the record simply does not support appellants’ claim.
The only agreement to contain such language is the 1957 East Cotton Valley Pettit Unit unitization agreement. Appellants have placed great emphasis on two clauses of this agreement. First is the “Continuation of Leases” clause which provides that unit operations will interrupt prescription as to every affected servitude tract. Second is the “Prescription” clause, which provides that anyone who joins in the agreement acknowledges a user of mineral rights sufficient to interrupt prescription,
it being the intention [of this agreement] that no mineral * * * rights presently existing or hereafter acquired in the Unitized Area and covered by this agreement shall prescribe during the life of this agreement * * *.
This language makes it abundantly clear that the 1957 agreement has prospective effect only. Furthermore, both the “Continuation” and the “Prescription” clauses are phrased entirely in the future tense. Since this agreement came on the scene years after prescription had accrued, it cannot have the effect appellants now insist on.
We therefore hold, with the trial court, that neither on-tract nor off-tract operations served to interrupt nonuse of the mineral servitude on the 60 acres.
Appellants finally contend that even if the servitude expired for nonuse, the appel-lees subsequently revived it by ratifying the East Cotton Valley Pettit Unit agreement in 1957. The original agreement established a large voluntary unit years after the servitudes had expired. Only three oil companies, however, drafted and executed this agreement; the servitude owners each executed a subsequent “ratification of uni-tization agreement” in order to join the unit. The Pruitts signed a ratification which, according to appellants, acknowl *938 edged the mineral claimants’ mineral rights.
The trial court, however, found that the “ratification” signed by the Pruitts did not revive the prescribed servitude. The one-page ratification asserts only that Mr. Pruitt “is or claims to be” a royalty owner and that he joins in the unitization agreement. The original unitization agreement, which it incorporates by reference, likewise fails to identify any designated parties as “mineral owners.” It does include a map of the several tracts comprising the unit but does not identify any servi-tudes that bear on the tract. Neither the unitization agreement nor the subsequent ratification is sufficient to interrupt prescription. See Roberts v. Cooper, 127 So.2d 369 (La.App. 2d Cir.1961), which lists the requirements:
(1) The specific identification of the parties designated in the agreement as “mineral owners.”
(2) The specific description of the several tracts comprising the unit.
(3) The identification of the servitudes bearing on the several tracts.
(4) Specific, clear and concise acknowledgment of the right of the person whose title the debtor or possessor prescribes adequately describing the property to which it applies.
(5) A sufficient identification of the servitude as to which acknowledgment is sought to be made. 127 So.2d at 372.
We agree with the trial court’s conclusion, but it is not even necessary to analyze the “ratification” or the unitization agreement as an acknowledgment or a renunciation of prescription. On the contrary, appellees correctly point out that it is impossible to resuscitate a servitude lost to nonuse. Legal execution of a unitization agreement after prescription has accrued cannot have such an effect. Baker v. Chevron Oil Co., 260 La. 1143, 258 So.2d 531 (1972); United Oil of Calif. v. Touchet, 229 La. 316, 86 So.2d 50 (1956). The Pruitts could have established a new servitude by following the appropriate formalities, LSA-R.S. 31:18, but since they did not, the servitude is extinguished as to the 60 acres in dispute.
The trial court’s factual findings are not manifestly erroneous; the legal conclusions are correct and the judgment is affirmed at appellants’ costs.
AFFIRMED.

. The named defendant in this case is James H. Pruitt, who inherited the tract after his parents’ deaths. At trial, he and his son, James S. Pruitt (James T.’s grandson), testified. Since the trial in April 1981, James H. Pruitt has died, so his son and widow have been substituted as parties defendant. The Pruitts' 1944 deed describes only 220 acres but includes the 60 acres at issue. No one has challenged this apparent discrepancy and it has no effect on the outcome of the case.

. Bodcaw’s depth is about 8,650 ft.; Hill Sand is only about 4,785 ft. R.p. 268, 278.